In re J.P. JEANNERET ASSOCIATES, INC., et al.

This Document Relates To: Securities Actions.

No. 09 Civ. 3907(CM).

United States District Court, S.D. New York.

Jan. 31, 2011.

Amy C. Williams–Derry, Derek W. Loeser, Havila C. Unrein, Lynn Lincoln Sarko, Havila C. Unrein, Lynn Lincoln Sarko, Keller Rohrback L.L.P., Seattle, WA, Barbara J. Hart, Stephen Lowey, Deborah A. Rogozinski, Thomas Michael Skelton, Todd Seth Garber, Lowey Dannenberg Cohen & Hart, P.C., White Plains, NY, David Steven Preminger, Keller Rohrback L.L.P., Milo Silberstein, Dealy & Silberstein, LLP, New York, NY, Shannon O. Lack, Edward W. Ciolko, Joseph H. Meltzer, Peter H. Levan, Jr., Shannon O. Lack, Cheri R. Tolin, Barroway Topaz Kessler Meltzer & Check, LLP, Radnor, PA, for Plaintiffs.

Brian E. Whiteley, Carolyn Anne Marcotte, Hiscock & Barclay, LLP, Boston, MA, Gabriel Mark Nugent, Hiscock & Barclay, LLP, Evan Glassman, Steptoe & Johnson, LLP, Jeffrey A. Rosenthal, Lewis J. Liman, Cleary Gottlieb Steen & Hamilton, LLP, New York, NY, John Donald Cook, Hiscock & Barclay, LLP, Syracuse, NY, Nowell D. Bamberger, Steven J. Kaiser, Cleary Gottlieb Steen & Hamilton LLP, Jeffrey E. McFadden, Steptoe & Johnson, LLP, Stephen Aaron Silverman, United States Dept. of Labor, Washington, DC, for Defendants.

DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT

McMAHON, District Judge:

## INTRODUCTION

This is one of a series of actions (all pending before different judges of this court) in which investors in so-called "feeder—funds" funds that invested client assets with Bernard J. Madoff—seek to recover from those feeder funds and their fiduciaries.

In this case, the defendants fall into three groups: Ivy Asset Management and related parties, including Ivy's principal, Lawrence Simon (the "Ivy Defendants"); and John P. Jeanneret and entities associated with him (the "Jeanneret Defendants"); and Margolin (the "Accounting Defendants" or "Margolin Defendants"). Plaintiffs also sue the Bank of New York ("BONY"), which acquired Ivy in 2000.

In deciding these motions, the Court has the advantage of being able to refer to a thorough and well-reasoned decision by my colleague, The Hon. Leonard B. Sand, who in the main denied motions to dismiss virtually identical claims against the Ivy and Jeanneret Defendants in cases relating to another of the Madoff feeder funds, Beacon Associates. Judge Sand also dismissed analogous claims against a different accounting firm and BONY.

The Margolin Defendants' motion to dismiss is granted; the Jeanneret Defendants' motion to dismiss the federal securities law claims against them is denied; the Ivy Defendants' motion to dismiss the federal securities law claims against them is granted in part and denied in part. The various state law claims are disposed of in the same manner that Judge Sand disposed of identical claims in the Beacon Associates litigation.

## BACKGROUND [1]

### I. Statement of Factual Allegations

*The Madoff Scheme*

As Judge Sand wrote in his recent opinion and order in *In re Beacon Associates*

1. The Background section is based on facts alleged in the SCAC and supporting docu-

*Litigation,* 745 F.Supp.2d 386 (S.D.N.Y. 2010), the basic facts surrounding Madoff's historic Ponzi scheme are by now well known. In the interest of brevity, I will not repeat them here, but simply adopt Judge Sand's description of the Madoff fraud.

*Plaintiffs*

The named Plaintiffs in the securities class actions represent two classes of investors.

The first class, known as the "Income Plus Class,'" is made up of persons who invested in a hedge fund called the Income–Plus Investment Fund, which was promoted through Offering Memoranda (OMs) that were issued in 1993, and again in 2003. (December 17, 2010 Letter from Barbra Hart ("Hart Letter") at 1.)

The second class, the so-called Direct Investor Class, is made up of persons who entrusted money to John P. Jeanneret Associates (JPJA) pursuant to Discretionary Investment Management Agreements ("DIMAs"), with the understanding that the money so entrusted would be invested with Madoff or his enterprise, Bernard Madoff Investment Securities ("BMIS"). (*Id.* at 2–3.) To the extent that persons who had DIMAs with JPJA invested in Madoff by a more circuitous route—as, for example, by having JPJA place them into Beacon Associates or Income Plus, which in turn invested in/with Madoff—such individuals are not members of the Direct Investor Class. (*Id.* at 2.) Although Plaintiffs counsel refers to this class as the "Ivy Direct Investor Class," a more appropriate moniker, and the one this court will use, is the JPJA Direct Investor Class.

*Defendants*

**The Ivy Defendants:** Ivy Asset Management Corp., and later its successor in interest, Ivy Asset Management, LLC, were investment advisors to the Income–Plus Fund. (Second Amended Class Action Complaint ("SCAC") ¶ 1.) Ivy was founded in 1983 by Lawrence Simon and Howard Wohl, who are also named as Defendants in this action. Ivy is a registered investment advisor. It serves as an investment advisor to asset managers and other investment advisors, and it manages the assets of high net worth individuals and institutions. (*Id.*) Ivy also maintains and manages certain proprietary Funds of Funds. (*Id.* ¶¶ 36–38.)

Beginning in or about 1987 and continuing until around 2000, Ivy invested the assets of some of its proprietary funds with Madoff. (N.Y. AG Compl. ¶ 31.)

Ivy was acquired by Defendant Bank of New York Mellon Corp. (BONY) in October 2000. (*Id.* ¶ 7.)

Other Ivy-related Defendants include various individuals who worked for Ivy during the late 1990s and into the following decade:

Adam Geiger who began working at Ivy in 1997 and eventually served as Ivy's Chief Investment Officer until at least May 2006. (*Id.* ¶ 39.)

Jeffrey Lindenbaum who served as Ivy's Chief Financial Officer from before 2000 until March of 2001. (*Id.* ¶ 40.)

John Rogers, who began working at Ivy in July 2000, and eventually served as Managing Director in the Ivy Investment Products Group until March of 2004. (*Id.* ¶ 41.)

---

mentation submitted to the Court, as well as facts alleged in the New York State Attorney General's complaint against Ivy filed on May 11, 2010 in New York State Supreme Court,

on which Plaintiffs rely. *See* Complaint, *People v. Ivy Asset Management. LLC,* No, 450489/2010, 2010 WL 1976425 (N.Y. Sup.Ct. May. 11, 2010) ("NY AG Compl.")

Sean Simon, who began working at Ivy in July of 2000, and eventually served as Managing Director in the Ivy Investment Products Group until April 2007. (*Id.* ¶ 42.)

Kevin Bannon, who served as a member of the Ivy Board of Directors and Chief Investment Officer from sometime prior to March 31, 2004 until April 2007. (*Id.* ¶ 43.)

Steven Pisarkiewcz, who served as Chairman of the Ivy Board of Directors from July 2003 until April 2007. (*Id.* ¶ 44.)

Robert Meschi, who began working at Ivy in January 2000 in a position referred to as the "Director of Research" and eventually served as a Director of Ivy Investments from April 2002 until May 2006. (*Id.* ¶ 45.)

Susan Rabinowitz, who served as Ivy's Vice President of Investments from 2003 until March 2004. (*Id.* ¶ 46.)

Alan Chuang, who served as Ivy's Director of Investments and Head of Portfolio Management from January 2006 until May 2006. (*Id.* ¶ 47.)

Gregory Van Inwegen who, from January 2007 until after December 2008, served as a Director of Ivy's Investments Quantitative Research and Risk Management division and ultimately Managing Director and Chief Investment Risk Officer of Ivy. (SCAC ¶ 48.)

Sean Cumiskey who, from January 2006 until after December 2008, served as Managing Director, Head of Ivy's Investment Strategies Group, Capital Markets Coverage Team, and as a member of the Manager Approval Committee. (*Id.* ¶ 49.)

Stuart Davies who from January 2006 until sometime before January 2009, worked in numerous positions at Ivy including Managing Director and Head of Ivy's Investments in Europe and Asia, as a Member of Ivy's Manager Approval Committee, and Global Head of Investments. (*Id.* ¶ 50.)

Joseph Burns, who worked at Ivy from January 2006 until after December 2008 eventually serving as Ivy's Director of Investments and Head of Long/Short Equity. (*Id.* ¶ 51.)

Mark Santero, who served as a Managing Director in Ivy's Investments from January 2006 until February 2007 and also as a member of Ivy's Manager Approval Committee. (*Id.* ¶ 52.)

Peter Noris, who served as Ivy's Chief Investment Officer from February 2007 until sometime after March 2008 and as chair of Ivy's Manager Investment Committee. (*Id.* ¶ 53.)

Farzine Hachemian, who worked at Ivy from May 2007 until December 2008 and, starting March 2008, headed Ivy's Portfolio Management Group. (*Id.* ¶ 54.)

Scott Wennerholm, who served on Ivy's Board of Directors from March 2008 until December 2008. (*Id.* ¶ 55.)

Jonathan Little, who served on Ivy's Board of Directors from March 2008 until December 2008. (*Id.* ¶ 56.)

Ronald P. O'Hanley, who served on Ivy's Board of Directors from March 2008 until December 2008. (*Id.* ¶ 57.)

**The Jeanneret Defendants:** In the late 1980s, Simon met John P. Jeanneret, who, through his company, J.P. Jeanneret Associates, Inc., (JPJA), offered asset management and investment consulting services to upstate New York union pension and welfare funds. Paul L Perry, who is also named as a defendant in this action, was Jeanneret's associate and a director of JPJA. (*Id.* ¶¶ 33–35.)

**The Accounting Defendants:** Margolin, Winer & Evens LLP ("Margolin") was the accounting firm retained as the independent auditor to the Income Plus Fund. In its role as auditor of the Income Plus Fund. Margolin regularly issued audit

opinions regarding the financial statements issued by Income Plus. (SCAC ¶ 61.)

*Ivy/Jeanneret Contract*

In or about 1990. Ivy introduced Jeanneret to Madoff. The Second Amended Class Action Complaint does not allege whether Jeanneret sought the introduction or if the idea originated with Ivy.

In 1991, Ivy and JPJA entered into an "Consulting Agreement" pursuant to which JPJA agreed to pay Ivy 50% of any fees that JPJA earned by placing investors with Madoff or other Ivy-recommended investment managers. (SCAC ¶ 80, 81, 161–162.) If the number of JPJA clients who invested with Ivy-recommended managers dropped below two, Ivy would instead be entitled to receive 60% of JPJA's investment management fee. (*Id.* ¶ 162.) Ivy's entree to Madoff was allegedly the number one reason why JPJA entered into this unorthodox (to say the least) arrangement. (*Id.* ¶¶ 160–162.)

Ivy's responsibilities under this agreement were as follows:

(a) Research, identify, monitor, evaluate and meet with potential investment managers;

(b) Recommend investment managers;

(c) Advise ... as to the availability of opportunities to invest [JPJA's] Client funds with particular investment managers;

(d) Monitor, evaluate and meet with investment managers that are managing [JPJA's] Client funds invested through [JPJA];

(e) Assess the performance of investment managers managing [JPJA's] Client funds invested through JPJA and make periodic recommendations with respect to such performance;

(f) Maintain such records as are mutually deemed appropriate by IVY and JPJA relating to the recommendation, retention, performance and services of investment managers recommended by IVY and selected by Associates to manage the Client funds invested through Associates: and

(g) Provide associates with such documentation as it reasonably requires with respect to investments of [JPJA's] Client funds with investment managers such that JPJA may maintain compliance with the record-keeping requirements of the Advisers Act.

(1991 Consulting Agreement ("1991 CA"), Rosenthal Decl. Ex. C § 3.).

In 1993, JPJA created The Income Plus Investment Fund as a vehicle through which individuals, charities, pension funds and retirement accounts, institutions and other entities—including other hedge funds—could invest with Madoff. JPJA offered unit interests in Income–Plus, which was structured as a tax-exempt collective investment trust designed to pool the investment assets of investor entities. (SCAC ¶ 181.) Income Plus Fund was established by a Declaration dated December 15, 1993, under the Master–Income–Pius Group Trust ("Group Trust"). (1993 Offering Memorandum ("1993 OM"), Rosenthal Decl. Ex. H.) The Group Trust was established pursuant to an Agreement of Trust ("Group Trust Agreement") dated February 23, 1993, between the Custodial Trust Company, as Trustee, and Jeanneret Associates, as Investment Manager. (*Id.*)

Participation in The Income Plus Fund was offered to investors through confidential Offering Memoranda (OM) that were released in 1993 and in 2003. (SCAC ¶ 50.) The Offering Memoranda were substantially identical. They identified—Ivy described as a "global leader in alternative investment fund-of-funds portfolio management" with "approximately $12 billion

of assets under management"—as JPJA's "Investment Advisor." (*Id.*) As the Investment Advisor, Ivy was obligated to advise JPJA with respect to investing Income Plus' assets and to conduct due diligence on managers with whom JPJA allocated Income Plus' assets. (SCAC ¶ 81) (citing the 1993 OM.)

JPJA, serving as the Investment Manager of the Income–Plus Fund, allegedly invested more than forty percent of the Fund with Madoff. (SCAC ¶ 94.)

JPJA also executed "DIMAs" (Discretionary Investment Management Agreements) with various investors. Pursuant to the DIMAs, JPJA was appointed as attorney-in-fact for the investor for the purpose of "invest[ing] and reinvest[ing] the assets received and deposited with the custodian ... for investments by the Investment Manager, and/or to appoint other investment advisors subject to the Investment Manager's oversight to invest and reinvest such assets, as fully as the Board itself could do." (SCAC ¶ 153) (quoting the July 1, 1996 Discretionary–Investment Management Agreement between Local 267 Pension Fund and JPJA (the "1996 DIMA"), at 1.) The DIMAs listed BMIS as the investment "Custodian" with whom DIMA assets would be deposited. (*Id.*) (Citing *id.*) A one page summary entitled "Investment Guidelines" was attached to the DIMAs. In the DIMA Investment Guidelines' description of the put and call options trading strategy that was listed as one of the primary trading strategies for the DIMA assets, the Guidelines provided that "at the discretion of Bernard L. Madoff, long put positions may carry expiration dates of greater duration than short call positions." (*Id.* at 8.) JPJA allegedly placed money entrusted to it pursuant to the DIMAS directly with Madoff or BMIS, as contemplated by these provisions of the DIMAs. (SCAC ¶ 19.)

*Ivy's Relationship to Jeanneret vis a vis Madoff*

When Ivy and Jeanneret first entered into their relationship, Ivy and its own clients also invested with Madoff. (*Id.* ¶ 96.)

The Ivy Defendants knew of rumors calling Madoff's *bona fides* into question as long ago as the early 1990s. In fact, in 1991, Simon allegedly told a prospective investor that Madoff could be running a Ponzi scheme. (*Id.* ¶ 80.)

In 1997, Ivy became suspicious about Madoff's stated investment strategy-the so-called "split strike" strategy because it seemed to Wohl that the number of S & P 100 Index options traded on a given day at the Chicago Board of Options was insufficient to support what Madoff claimed to be doing (based on Ivy's estimate of how much money Madoff had under management). (*Id.* ¶ 86.) Internal memos written by Ivy employees at or about this time urged that Ivy "explore this further" and noted that Ivy had "inability to make sense of Madoff's strategy" because "his trades for our accounts are inconsistent with the independent information that is available to us." (*Id.* ¶ 88.)

Ivy also became concerned that Madoff might be using client money to fund his separate market-making business, and that there was no way to verify Madoff's trades with independent data because of his practice of "self-clearing" trades. (SCAC ¶ 93.) During the years 1997–98, Madoff gave Ivy at least three different explanations for his trading practices; none of the explanations made sense and the three were not consistent with each other. (*Id.*)

Wohl actually argued, as early as 1998, that Ivy should divest itself of its Madoff investments completely. (*Id.* ¶ 100.) Simon, however, vetoed that idea, saying, "....it is important to maintain at least

some level of Ivy fund investments with Madoff in order to send a message to [our] advisor clients that we have confidence in him." (*Id.* ¶ 101.) This is an extraordinary statement, given that Ivy (or at least Wohl) apparently did not have a great deal of confidence in Madoff. Simon reasoned as follows:

> Amount we now have with Bernie in Ivy's partnership is probably less than $5 million. The bigger issue is the 190 mill of so that our relationships have with him which leads to two problems, we are on the legal hook in almost all of the relationships and the fees generated are estimated based on 17+% returns....[to be] $1,275 Million
>
> Are we prepared to take all the chips off the table, have assets decrease by over $300 million and over overall fees reduced by $1.6 million or more, and, one wonders if we ever "escape" the legal issue of being the asset allocator and introduced, even if we terminate all Madoff related relationships?

(SCAC ¶ 101) (quoting Simon e-mail.) To paraphrase: Simon reminded Wohl that Ivy itself actually had very little exposure to Madoff-less than $5 million—but the firm had considerable exposure to "relationships" (i.e., to Ivy's clients), which collectively (i) had a lot of money invested with Madoff ("$190 million or so"), (ii) whose assets made up a significant fraction of Ivy's total assets under management (estimated at 15%); and (iii) which generated about 16% of Ivy's annual revenue (the $1.6 million in fees).

Ivy's desire to keep those assets under management—and to continue earning those hefty fees—led Simon to reject Wohl's suggestion. Ivy's management also overrode the suggestion of its Chief of Investment Management, Adam Geiger, who had suggested a "middle of the road" approach, in which Ivy would (1) pull all of its proprietary Funds out of Madoff, (2)

write to its advisory clients telling them what it had done and why, and (3) let the advisory clients decide whether to continue investing in Madoff's fund. (SCAC ¶ 104.)

However, Ivy did limit its proprietary investment in Madoff to 3% of the fund's value, which was only half of what it would normally have permitted under the rules applicable to its accounts. (*Id.* ¶ 105.) Ivy also recommended a "below-median allocation" for JPJA's investment in Madoff. But Ivy insisted to its clients (including JPJA) that its only concern about Madoff was his continued ability to manage such a large pool of assets with his accustomed degree of success. (*Id.* ¶ 107.) Indeed, Jeanneret's notes from a December 30, 1998 meeting with Ivy reflect that Ivy's due diligence "shows no problem for Madoff." (*Id.* ¶ 106.)

Nonetheless, little by little, Ivy began to hint that its enthusiasm for Madoff was waning. On January 12, 1999, for example, Ivy sent a letter to Jeanneret, which stated, "We have no reason to believe that the Madoff account is anything other than what Ivy's experience has shown and what the record demonstrates......[but] due to a lack of external corroborative evidence, we cannot 'close the loop' in a manner than gives us total comfort." (*Id.* ¶ 107.) Ivy also reiterated concern about Madoff s lack of a separate custodian for the securities he traded, and stated that Ivy "continu[ed] to question [Madoff's] ability to manage what must be an enormous pool of capital with such consistently outstanding results." (*Id.* ¶ 110.) (quoting January 12, 1999 Letter from Ivy to JPJA.)

In April 2000, Ivy representatives met with Jeanneret, who asked, "Is he [Madoff] essentially legitimate?" (*Id.* ¶ 115) (quoting Ivy Notes of Meeting held April 2000.) Robert Meschi, Ivy's Director of Research, responded, *"essentially* legitimate." (*Id.*) (Emphasis added). However, Meschi ad-

mitted that Ivy was limiting its own stake in Madoff because Ivy could not "close the loop" on him. (*Id.*)

Although Ivy expressed some concerns to JPJA in 2001 about Madoff, Ivy significantly mischaracterized and understated its concerns, stating in a letter to JPJA:

> "We take this opportunity to state our long-held concerns about the continued ability of this manager to produce consistent returns on what must be an enormous amount of capital under management, and to note our inability to perform due diligence due to limitations set by Madoff. For these reasons, we recommend harvesting profits or otherwise trimming allocations to this manager."

(SCAC ¶ 123) (quoting Ivy Letter to JPJA dated August 3, 2001.)

*Ivy Withdraws Its Proprietary Investments From Madoff*

In late 2000, Ivy withdrew its entire proprietary investments from the "essentially legitimate" Madoff. (*Id.* ¶ 117.) At the time, Ivy was about to be acquired by BONY—a transaction in which Simon and Wohl each stood to make approximately $100 million. There are conflicting allegations about who precipitated the withdrawal (Madoff or Ivy); Ivy insists that Madoff refused to deal with it after the BONY acquisition, but Wohl and Simon's son Sean are both on record as having said that Ivy, not Madoff, ended the relationship. (*Id.* ¶ 118.)

Shortly after getting Ivy's own funds out of Madoff, Simon advised at least one client to divest its (small) Madoff investment. (*Id.* ¶ 121.) When Wohl told another client that Ivy had withdrawn its proprietary funds from Madoff, the client responded, "If it's not good enough for you, then it should be out of us." (*Id.* ¶ 122) (quoting NYAG Compl. ¶ 108.) However, Ivy did not tell Jeanneret/JPJA

that it had extricated itself from any direct exposure to Madoff.

And when Wohl suggested that Ivy exclude a large pension fund client that was heavily invested in Madoff from Ivy's responsibility, Simon responded, "You may be spending too much time in the sun! If we give up Madoff, [Jeanneret] has the opportunity to move in." (*Id.* ¶ 126) (quoting Larry Simon e-mail dated June 2001.) Simon wrote in June 2001 that this particular pension fund's Madoff investment "helped to contribute towards building Ivy's [assets under management] and credibility, despite our real concerns about him." (*Id.* ¶ 103) (quoting Larry Simon e-mail dated June 2001.)

*Ivy Reveals That It Is Not Performing Due Diligence on Madoff*

Finally, in a letter sent by Simon and Geiger to Jeanneret in August 2001, Ivy abandoned euphemisms like "can't close the loop" and flat out admitted "[Ivy's] inability to perform due diligence due to limitations set by Madoff." (*Id.* ¶ 123) (quoting Ivy Letter to JPJA dated August 3, 2001.) In fact, according to testimony given by Simon, Ivy stopped making due diligence visits to Madoff, because it did not feel welcome after it had withdrawn its proprietary funds from Madoff. (*Id.* ¶ 123) (citing Testimony of Larry Simon.) Ivy apparently did not reveal its withdrawal from Madoff, or its advice to its own clients to do so, at that time.

**The 2003 Offering Memorandum for Income Plus/2007 Ivy Advisory Amendment**

In 2003, JPJA issued another OM for Income–Plus (*Id.* ¶ 130.) Like its predecessor, this OM designated Ivy as the "Investment Advisor." The 2003 OM listed the same responsibilities for Ivy as Investment Advisor that were listed in the 1991 OM-providing due diligence research with respect to potential investment managers,

making recommendations to JPJA regarding which investment managers should select for investing Income Plus assets, and monitoring performance of investment managers that are managing Income Plus assets. (SCAC ¶ 129) (citing 2003 OM at 1.) In addition, the 2003 OM also explicitly stated that when Ivy and JPJA identified investment managers who "achieved above-average returns through different market cycles.... [Ivy and JPJA] would engage in further investigation in order to validate the results shown and where possible judge the [investment manager's] adherence to their stated strategy." (*Id.*) (quoting the 2003 OM at 4.)

Thereafter, JPJA continued to put its clients into Madoff investments, both directly and via their participation in Income Plus. It continued to pay handsome fees to Ivy pursuant to their agreement. That agreement was not modified until December 1, 2007, when Ivy and JPJA executed a new advisory contract. Plaintiffs allege in the SCAC that Ivy executed the 2007 agreement because it had determined that Madoff was one of Ivy's "top ten business risks" and accordingly sought to insulate itself from potential liability arising from its sub-advisory relationship with JPJA. (SCAC ¶ 141.) The 2007 advisory agreement between Ivy and JPJA expressly excluded Madoff from Ivy's scope of due diligence services. (*Id.* ¶ 141) (citing the 2007 Amended and Restated Subadvisory Agreement between Ivy and JPJA.)

*Madoff Fraud Revealed*

Madoff's fraud was finally uncovered in late 2008, after he confessed to his sons that he had been running a Ponzi scheme all along. The world learned the truth in headlines that appeared on the morning of December 11, 2008, when Madoff was arrested at his apartment. (*Id.* ¶ 12.)

Madoff pleaded guilty to securities fraud and related offenses on March 12, 2009. He was eventually sentenced to 150 years

in prison by The Hon. Denny Chin, Madoff's accountant, David Friehling of Friehling & Horowitz CPAs, P.C., is under indictment. His chief Financial Officer, Frank DiPascali, pleaded guilty to conspiracy to commit securities fraud and related offenses. Two computer programmers who worked for Madoff were indicted for aiding and abetting Madoff's scheme in November 2009. Irving Picard, the trustee of Madoff's bankrupt estate, continues to try to claw back assets from members of his family and various investors who over time "redeemed" more from the fraudulent investment fund than they "invested" in the first place. Recently, Picard has begun suing banks that failed to detect (or allegedly consciously avoided detecting) the true nature of Madoff's activities.

On May 10, 2010, the New York State Attorney General filed a civil complaint against Ivy, Simon and Wohl in the New York State Supreme Court, alleging that they had committed fraud and related offenses. The above recital, which is taken principally from Judge Sand's summary of the Second Consolidated Amended Complaint in the Beacon Associates lawsuit, is predicated in substantial part on allegations set forth in the Attorney General's complaint.

## DISCUSSION

### I. Standard of Review

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court must liberally construe all claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 44 (2d Cir.2003); *see also Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir.2007).

However, to survive a motion to dismiss, "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* — U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955 (internal quotations, citations, and alterations omitted). Thus, unless a plaintiff's well-pleaded allegations have "nudged [its] claims across the line from conceivable to plausible, [the plaintiff's] complaint must be dismissed." *Id.* at 570, 127 S.Ct. 1955; *Iqbal,* 129 S.Ct. at 1950–51.

■ Section 10(b) and Rule 1b–5 claims, like the ones asserted in this lawsuit, are subject to the special (and heightened) pleading requirements of the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. §§ 77z–1, 78u–4 and Fed.R.Civ.P. 9(b). These laws and rules require a complainant to: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Fed. R. Civ. P, 9(b) (fraud must be pleaded with particularity); *see, Lerner v. Fleet Bank, N.A.,* 459 F.3d 273, 290 (2d Cir.2006) (quoting *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993)) (internal quotation marks omitted). Any type of fraud is subject to

the heightened pleading rules of Rule 9(b), which provides that "intent, knowledge, and other conditions of mind may be averred generally." However, in a federal securities case, the plaintiff must allege sufficient facts to create a "strong inference" of scienter. *Kalnit v. Eichler,* 264 F.3d 131, 137–38 (2d Cir.2001) A "strong inference" of scienter can be established through factual allegations showing "motive and opportunity to commit fraud" or "strong circumstantial evidence of conscious misbehavior or recklessness." *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.,* 381 F.Supp.2d 192, 206 (S.D.N.Y. 2004).

■ "'While we normally draw reasonable inferences in the non-movant's favor on a motion to dismiss,'" the PSLRA "establishes a more stringent rule for inferences involving scienter" because the PSLRA requires particular allegations giving rise to a strong inference of scienter. *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,* 553 F.3d 187, 196 (2d Cir.2009) (quoting *Teamsters Local 445 Freight Div., Pension Fund v. Dynex Capital Inc.,* 531 F.3d 190, 194 (2d Cir.2008)). "An inference of scienter must be more than merely plausible or reasonable-it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 314, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007).

Finally, in deciding a motion to dismiss, a court may consider the full text of documents that are quoted in or attached to the complaint, or documents that the plaintiff either possessed or knew about and relied upon in bringing the suit. *Rothman v. Gregor,* 220 F.3d 81, 88–89 (2d Cir.2000) (citing *Cortec Indus. Inc. v. Sum Holding L.P.,* 949 F.2d 42 (2d Cir.1991). *cert denied.* 503 U.S. 960, 112 S.Ct. 1561, 118

L.Ed.2d 208 (1992)); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808 (2d Cir.1996). "Plaintiffs' failure to include matters of which as pleaders they had notice and which were integral to their claim—and that they apparently most wanted to avoid—may not serve as a means of forestalling the district court's decision on the motion." *Cortec*, 949 F.2d at 44 (2d Cir.1991); *see also I. Meyer Pincus & Assocs. P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir.1991) ("plaintiff cannot evade a properly argued motion to dismiss simply because plaintiff has chosen not to attach the [document] to the complaint or to incorporate it by reference").

The pending motions will be evaluated against these standards.

## II. The Jeanneret Defendants' Motion to Dismiss the Securities Claims Against Them is Denied.

### 1. Claims Under Section 10(b) and Rule 10b–5.

■ The Jeanneret Defendants move to dismiss the claim asserted against them pursuant to Section 10(b) of the Exchange Act and Rule 10b–5, That motion is denied, as both proposed classes have viable claims for nondisclosure and misrepresentation employing well-settled theories of recovery.

Section 10(b) of the 1934 Act provides that no person or entity may, in connection with the purchase or sale of a security, "use or employ ... any manipulative or deceptive device or contrivance" in contravention of an SEC rule. 15 U.S.C. § 78j(b). Rule 10b–5 makes it unlawful, in connection with the purchase or sale of a security, "(a) to employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact or ... omit ... a material fact necessary in order to make the statements made ... not misleading, or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b–5.

■ In order to succeed on a claim, a "plaintiff must establish that 'the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff.'" *Lawrence v. Cohn*, 325 F.3d 141, 147 (2d Cir.2003) (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir.2000)). In order for the misstatement to be material, "'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).

The statute of limitations for claims under the federal securities laws is the longer of two years from the date the fraud was discovered or five years from the date it was perpetrated. 28 U.S.C. § 1658(b); *see also Nathel v. Siegal*, 592 F.Supp.2d 452, 461 (S.D.N.Y.2008). The securities fraud action was filed on April 17, 2009. Misrepresentations or omissions that were made prior to April 17, 2004 are, therefore, time barred.[2]

However, the complaint in this case, like the complaint before Judge Sand, contains numerous allegations that, read together,

---

**2.** As the Court advised the parties during oral argument, the time to sort out exactly who among the putative class members does or does not have a viable claim will be when plaintiffs file their motion for class certification—not today.

tend to show that JPJA committed securities fraud in connection with its solicitation of investments during the five years immediately prior to the filing of this lawsuit.

### (a) *Material Misrepresentation*

As long ago as 2001, the Jeanneret Defendants were told that Ivy was was *unable* to perform full-scale due diligence on Madoff's investments. (SCAC ¶ 123.) While Ivy was plainly withholding some information from JPJA—including the key fact that it had (allegedly) bailed out of its own stake in Madoff—Jeanneret knew that Ivy, which had a contractual obligation to "monitor, evaluate and meet with investment managers that [were] managing Client funds invested through [JPJA]" (1991 CA, Rosenthal Decl. Ex. C § 3), was not living up to its obligations under that agreement.

Despite this knowledge, in 2003 JPJA circulated an Offering Memorandum for Income Plus that contained the following language:

> The Investment Manager [JPJA] believes that satisfactory rates of return can be achieved on a consistent basis through various hedging and arbitrage strategies, *which have been thoroughly researched by the Investment Manager and its Advisor, Ivy Asset Management Corp.* As such the Investment Fund represents a vehicle for achievement of relatively consistent higher rates of return on pension and profit sharing plans and individual retirement accounts from year to year than the risk-free rate of return (i.e. Treasury Bills).
>
> . . .
>
> *The Investment Manager and the Advisor [Ivy] have and will continue to research, select and monitor the Managers that employ the varying strategies and techniques described [in the Offering Memorandum].* The Investment Manager and the Advisor begin the selection process by identifying Managers

which have achieved above-average returns through different market cycles. . . . *The Investment Manager and Advisor engage in further investigation in order to validate the results shown and where possible to judge the Managers' adherence to their stated strategies.*

(SCAC ¶ 129) (quoting 2003 OM at 1 & 4) (emphasis added). There was nothing in the OM about circumscribed due diligence with regard to investments in Madoff highly material piece of information for Income Plus participants to have before they purchased their interests in that fund.

Similarly, the Direct Investor Class invested on the basis of DIMAs that contained the following representation:

> [JPJA is] the [institutional investor's] attorney-in-fact to invest and reinvest the assets received and deposited with the custodian . . . for investment by the Investment Manager, and/or to appoint other investment advisors subject to the Investment Manager's oversight to invest and reinvest such assets, as fully as the Board itself could do. The Investment Manager hereby accepts this appointment, hereby acknowledges that it is a fiduciary with respect to the Plan, and agrees to supervise and direct the investment of the assets of the Plan in accordance with (i) the written investment guidelines [ . . . ] and, (ii) the current funding policy and method that have been established to carry out the objectives of the Plan as communicated to the Investment Manager.
>
> Subject to the attached Investment Guidelines, the Investment Manager and/or any investment advisors appointed by the Investment Manager and subject to its supervision may, in its full discretion and without obligation on its part to give prior notice to the Board, (a) buy, sell, exchange, convert and otherwise trade in any stocks, bonds and other securities, and (b) establish and

execute security transactions, through accounts with such brokers or dealers as the Investment manager and/or any appointed investment advisor may select, except to the extent otherwise directed by the Board; provided however, that all such activities shall be conducted in a manner consistent with the Investment Guidelines, the Investment Manager's obligations hereunder ...

(July 1, 1996 Discretionary Investment Management Agreement between Local 267 Pension Fund and JPJA (the "1996 DIMA") at 1.) The Investment Management Agreement further stated that JPJA:

Shall perform its duties [...] with the care, skill, prudence, and diligence, under the circumstances then prevailing, [...] and shall diversify the Investment Account Assets so as to avoid the risk of large losses ...

(*Id.* at 2.) In that Jeanneret knew perfectly well that Ivy these statements in the DIMA also appear seriously flawed.

At oral argument, counsel for the Jeanneret Defendants argued that (i) JPJA, not Ivy, was contractually obligated to its (JPJA's) clients (whether pursuant to the OMs or the DIMAs) to perform due diligence on all of its investments (which would, of course, include Madoff); and (ii) the SCAC does not expressly allege JPJA (rather than Ivy) had failed to carry out that obligation, especially following Ivy's August 2001 letter. But the most *plausible* inference one can draw from the facts pleaded in the SCAC is that JPJA (i) delegated the due diligence function to Ivy where Madoff was concerned; (ii) knew from August 2001 through sometime in 2007 that Ivy was not performing due dili-

gence on Madoff; and (iii) did absolutely nothing about it. Since that inference is warranted if the facts pleaded are true, the SCAC adequately pleads material misrepresentation.

Pursuant to the 1991 Consulting Agreement, JPJA retained Ivy to, *inter alia,* perform due diligence on all managers it recommended to Jeanneret—a group that includes Madoff. The 1991 Agreement remained in full force and effect, without any amendment that changed this delegation, until December 2007. At that time—less than a year before the Madoff house of cards came tumbling down—the Consulting Agreement was *amended specifically to exclude Madoff from the list of managers on whom Ivy was contractually obligated to perform due diligence.*

It is fair to infer, from the fact that it entered into the 2007 amendment, that JPJA believed Ivy to be responsible for Madoff-related due diligence up until December 2007. From the totality of these well-pleaded facts one can fairly infer that JPJA continued "outsourcing" its promised due diligence obligation *vis a vis* Madoff to Ivy—*even though it had been told that Ivy was unable to perform due diligence on Madoff*—and that this was the state of affairs when the 2003 OM was prepared and at all relevant times thereafter.[3] Furthermore, that inference is far more plausible than the alternative inference suggested by Jeanneret's counsel, which is that JPJA could have begun performing due diligence on Madoff itself. Any such inference belied by Jeanneret's alleged need to rely on Ivy in order to have any entree to Madoff at all. (SCAC 36, 78,82, 150.)[4]

**3.** We also know, from Judge Sand's opinion, that Ivy sent letters to BMAC in 2002, 2003 and 2004 stating that Madoff's growing assets under management were Ivy's only concern. Eventually. Ivy ended any pretense of performing due diligence, because it stopped sending even those letters to BMAC. *In re*

*Beacon Assocs. Litig.,* 745 F.Supp.2d 386, 400, 2010 WL 3895582, at *7 (S.D.N.Y. Oct. 5, 2010).

**4.** The SCAC also alleges that JPJA "sheepish[ly]" substituted reliance on Ivy's assurances to substitute for its obligation to per-

Both the fact of the misrepresentation about performing due diligence and its materiality to a reasonable investor are patent. Income Plus investors were buying into a fund that would end up directing more than one third of its assets into investment with Madoff. (SCAC ¶ 94.) All of the funds invested by Direct Investors were invested directly with Madoff. (December 17, 2010 Hart Letter at 2.)[5]

### (b) *Reliance*

Reliance can be presumed from the materiality of the omission under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 31 L.Ed.2d 741(1972).

### (c) *In Connection With the Purchase/Sale of Security*

The "in connection with" requirement for maintaining a private right of action under Rule 10b–5 is also satisfied on the allegations against JPJA.

A nondisclosure or misrepresentation can serve as the basis for a private right of action only if it is made in connection with the purchase or sale of a security. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 731–32, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975): *see also* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5. For the Income Plus Class, the security purchased was the investor's interest in Income Plus. There does not seem to be any dispute that the investor's interest in Income Plus qualifies as a security.

The matter is slightly more complicated for the Direct Investor Class, but I am convinced that (1) the Madoff "purchases" and "sales" are enough to meet the "in connection with" requirement; and that (2) plaintiffs allege sufficient facts to warrant the conclusion that the DIMAs themselves are "securities." I will address the latter issue first.

■ **Plaintiffs Sufficiently Allege that the DIMAs are Securities:** First, plaintiffs sufficiently allege that the DIMAs themselves are securities. As a result, their claims can withstand a motion to dismiss.

Section 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(1), defines a "security" as:

> any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, pre-organization certificate or subscription, transferable share, *investment contract*, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a " 'security' ", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

15 U.S.C. § 77b(1) (emphasis added.) For the DIMAs to constitute a "security," they must fall within the definition of an investment contract.

---

form actual due diligence (SCAC ¶ 163) but of course that allegation could only pertain to the period prior to August 2001, when Ivy flat out stopped making assurances of any kind about Madoff.

**5.** Although the parties do not explicitly state in their submissions whether all of the DIMA funds invested by the Direct Investor class were invested entirely with Madoff, the DIMAs list Madoff as the "Custodian." (1996 DIMA at 6.) Madoff is also the only investment manager specifically named in the DIMA Investment Guidelines (*Id.* at at 8) which further suggests that all, or at least a significant fraction, of the Direct Investor DIMA funds were invested with Madoff.

■ The Supreme Court in *SEC v. Howey, Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), outlined a three-part test for determining when investment contracts are securities.[6] The Court defined an "investment contract" as "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise." *Id.* at 299, 66 S.Ct. 1100. Thus, under *Howey*, an investment contract is a security if there is (1) an investment of money, (2) in a common enterprise and (3) with profits derived solely from the efforts of others. *Id.; see also Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir.1994).

■ To establish the existence of a "common enterprise," Plaintiffs must show "horizontal commonality." *Revak*, 18 F.3d at 87. Horizontal commonality is characterized as "the tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, usually combined with the pro-rata distribution of profits." *Id.* As the Second Circuit explained in *Revak*, "horizontal commonality ties the fortunes of each investor in a pool of investors to the success of the overall venture. In fact, a finding of horizontal commonality requires a sharing or pooling of funds." *Id.* (quoting *Hart v. Pulte Homes of Michigan Corp.*, 735 F.2d 1001, 1004 (6th Cir.1984)). Neither party argues that horizontal commonality exists here. Indeed, there are no allegations in the SCAC that the plaintiffs in the Direct Class pooled their money for a common purpose.

Nonetheless, some courts have concluded that *Howey*'s "common enterprise" requirement can be satisfied with "vertical commonality." Vertical commonality exists in two forms: (1) strict vertical commonality and (2) broad vertical commonality.

■ Broad vertical commonality requires that the fortunes of the investors be linked to the efforts of the promoter or third party. *Revak*, 18 F.3d at 88. Although some circuits have concluded that the existence of broad vertical commonality is sufficient to meet the requirements of *Howey*, the Second Circuit squarely rejected this conclusion in *Revak*. The Court explained that "if a common enterprise can be established by the mere showing that the fortunes of investors are tied to the efforts of the promoter, two separate questions posed by *Howey*—whether a common enterprise exists and whether the investors' profits are to be derived solely from the efforts of others—are effectively merged into a single inquiry: 'whether the fortuity of the investments collectively is essentially dependent upon promoter expertise.'" *Id.* at 88 (quoting *SEC v. Continental Commodities Corp.*, 497 F.2d 516, 522 (5th Cir.1974)). Therefore, Plaintiffs cannot rely on broad commonality to sustain their claim that the DIMAs are securities.

■ Strict vertical commonality exists when the fortunes of the investor are tied to the fortunes of the promoter. *Id.* "Where strict vertical commonality exists, 'the fortunes of plaintiff and defendants are linked so that they rise and fall togeth-

---

6. Although the Court in *Howey* determined when an investment contract is a security as defined in the Securities Act of 1933, the definition of a "security" under the 1933 Act and the Exchange Act of 1934 are the same.

*See SEC v. Edwards*, 540 U.S. 389, 393, 124 S.Ct. 892, 157 L.Ed.2d 813 (2004). Under both the Securities Act and the Exchange Act, whether a scheme is an investment contract is determined by the test set out in *Howey*. *Id.*

er.'" *Jordan (Bermuda) Inv. Co., Ltd. v. Hunter Green Investments Ltd.*, 205 F.Supp.2d 243, 249 (S.D.N.Y.2002) (quoting *Dooner v. NMI Ltd.*, 725 F.Supp. 153, 159 (S.D.N.Y.1989)). In *Revak*, the Second Circuit did not consider whether strict vertical commonality satisfies *Howey*'s requirement of a common enterprise. Nonetheless courts in this district have held that strict vertical commonality (like horizontal commonality) is sufficient to establish a common enterprise under *Howey*, See e.g., *Jordan (Bermuda) Inv. Co.*, 205 F.Supp.2d at 249; *Louros v. Cyr*, 175 F.Supp.2d 497, 508–09 (S.D.N.Y.2001); *H.G. Heine v. Colton, Hartnick, Yamin & Sheresky*, 786 F.Supp. 360, 370 (S.D.N.Y. 1992); *Dooner v. NMI Limited*, 725 F.Supp. 153, 158 (S.D.N.Y.1989); *Perez–Rubio v. Wyckoff*, 718 F.Supp. 217, 234 (S.D.N.Y.1989).

Plaintiffs allege sufficient facts from which a trier could conclude that the DIMA links the fortunes of the investor to the fortunes of JPJA, Section 10 of the DIMA outlines the compensation of the investment manager (in this case, JPJA). The investment manager is paid (1) a basic quarterly fee in the amount of one-eighth of one percent (.00125) of the "closing value" of the assets in the investment account, and (2) a performance fee equal to 20% of the profits in the investment account that exceed the preferred return and the basic quarterly fee. (Local 267's 1996 DIMA at 5.) "Profits" are defined as "the aggregate appreciation in value of all Investment Account Assets" in the calendar year. (*Id.*) Thus, JPJA's compensation was dependent on the successful performance of the investment account. If profits were not generated in a calendar year, or if the profits did not exceed the preferred return, then JPJA did not receive a performance fee. Unlike a stockbroker, who collects a fee for every consummated transaction, JPJA's financial compensation was linked to the fortunes of the investors in the Direct Class. Under strict vertical commonality, this is sufficient to satisfy the "common enterprise" requirement of *Howey*. Accordingly, the DIMAs are securities under the 1934 Exchange Act.

Although I am discussing JPJA's motion, I address two arguments relating to this issue that were made by Ivy in its post-oral argument letter dated December 17, 2010, because the issue is the same as to both parties' motions.

First, Ivy argues that, under a horizontal commonality analysis, the DIMAs cannot be deemed securities because the DIMA investments were not part of a pooled group of funds, thus preventing a finding of common enterprise. That is correct. However, it does not dispose of vertical commonality.

Ivy also argues that the DIMAs are not securities, even under an application of the strict vertical commonality test, because Plaintiffs did not expect profits "solely from the efforts of the promoter or a third party." (Ivy Rply. Brf. at 37) (quoting *Howey*, 328 U.S, at 297, 66 S.Ct. 1100.) In support of their contention, Ivy points to the provision of the DIMAs which stated that JPJA or the investment managers it appointed could exercise transactions "except to the extent otherwise directed by [Plaintiffs]." (Local 267 DIMAs, Rosenthal Decl. Ex. E at 1–2.) Ivy further argues that the DIMAs also provided Plaintiffs with control over their investments because the agreements provided that Plaintiffs had the right to issue written investment guidelines to JPJA. Essentially, Ivy contends that these provisions of the DIMA agreements gave Plaintiffs the degree of control over DIMA investments that should cause the DIMAs to "fail the *Howey* test for a security." (Ivy. Rply. Brf. at 37.)

However, when determining whether a particular transaction constitutes a securi-

ty under the *Howey* test, courts should look beyond the formal terms of the arrangement and assess whether the reasonable expectation was one of significant investor control, or third-party control over the investor's funds. *United States v. Leonard,* 529 F.3d 83, 85 (2d Cir.2008). It appears to the Court that the DIMAs were not designed to be the type of investment vehicle through which investors would be actively involved in daily investment decisions or management. The DIMAs clearly state that JPJA and the investment managers it appointed could engage in financial transactions such as purchasing or selling stock "in [their] full discretion and without obligation on [their] part to give prior notice to [Plaintiffs]." (SCAC ¶ 153) (quoting Local 267 DIMA at 1–2.) Obviously Madoff acted without any interference at all from Plaintiffs; to the extent that DIMA money was invested exclusively (or primarily) with Madoff, it is absurd to conclude that Plaintiffs had significant control over their investments—they relied on Madoff to generate significant returns.

While the DIMAs identified the BMIS "split-strike" strategy as one of the primary investment strategies that would be employed by DIMA investment managers, the DIMAs explicitly stated that the investment managers were not limited to that strategy and could invest the DIMA funds as they saw fit. (*Id.*) Viewing the provisions of the DIMA cited by Ivy against this backdrop of the tremendous discretion delegated to the investment managers in the DIMAs, the facts pleaded support a finding that the DIMAs were not designed for meaningful investor participation. Of course, if the facts adduced during discovery give the lie to this interpretation, the issue will no doubt be revisited.

**Madoff's Purported Buying and Selling:** While it may seem counterintuitive, Madoff's purported buying and selling of

securities is itself sufficient to satisfy the "in connection with" requirement.

■ The "in connection with the purchase or sale" requirement must be construed "not technically and restrictively, but flexibly to effectuate its remedial purpose." *SEC v. Zandford,* 535 U.S. 813, 820–21, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002). In *SEC v. Zandford,* 535 U.S. 813, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002), the Supreme Court gave deference to the SEC's interpretation of the "in connection with the purchase or sale" requirement, explaining that

> [T]he SEC has consistently adopted a broad reading of the phrase "in connection with the purchase or sale of any security." It has maintained that a broker who accepts payment for securities that he never intends to deliver ... violates § 10(b) and Rule 10b–5. This interpretation of the ambiguous text of § 10(b), in the context of formal adjudication, is entitled to deference if it is reasonable.

*Id.* at 819–20, 122 S.Ct. 1899 (internal citations omitted). Pursuant to a broad interpretation of "in connection with," the Supreme Court held that the requirement was satisfied where a broker who had investment authority over a client's account sold the securities in the account and pocketed the sales proceeds. *Id.* While the fraudulent conduct alleged—misappropriation of the proceeds of securities sales—was not the direct result of a purchase or sale, the broker's scheme to defraud "coincided" sufficiently with the actual (and completely legitimate) sale of those securities to satisfy the "in connection with" requirement. *Zandford, supra.,* 535 U.S. at 820, 122 S.Ct. 1899.

There is, of course, a critically important difference between this case and *Zandford:* there the securities transactions really happened, while here they are com-

pletely fictitious. However, the *Zandford* Court cited with approval an SEC opinion in which the Commission concluded that the "in connection with" requirement could be satisfied even if securities were never actually purchased or sold. *Id.* at 819–820, 122 S.Ct. 1899. That opinion issued in a matter called In *In re Bauer,* 26 S.E.C. 770, 1947 WL 24474 (1947). In *Bauer,* defendants recommended the purchase of certain stocks to prospective investors, explaining that they had "inside information" that indicated that the value of the stock was about to rise. *Id.* at 3. Once the investor agreed to purchase the recommended securities, the defendants collected his money, but never actually purchased the securities, *Id.* at 3, 5—exactly like Madoff, though without an intermediary analogous to JPJA. The SEC concluded that the defendants had violated the anti-fraud provision of Section 10(b). *Id.* at 5. In *Zandford,* the Supreme Court explained that such an interpretation is entitled to deference. *Zandford,* 535 U.S. at 819–820, 122 S.Ct. 1899.

The Eleventh Circuit relied on *Zandford* and *In re Bauer* to conclude that the "in connection with the purchase or sale" requirement is satisfied even where, as here, no securities were actually purchased or sold. In *Grippo v. Perazzo,* 357 F.3d 1218 (11th Cir.2004), Perazzo approached Grippo about investing money in foreign currency-exchange markets and debt securities through T.S.C. Financial Corp. *Id.* at 1220. Based on Perazzo's representations, Grippo began investing with T.S.C. Financial. *Id.* Grippo eventually discovered that Perazzo was stealing the money rather than using it to buy securities and filed suit in federal district court. *Id.* at 1221. The district court dismissed Grippo's securities claims, concluding that he had failed to satisfy the "in connection with'" requirement, because Grippo could not connect his payment of monies to Perazzo with any actual purchase of an identifiable

security—or, for that matter, prove that the funds were ever actually invested in anything. *Id.* Relying on *Zandford,* the Eleventh Circuit reversed. *Id.* 1223–24. The court explained that the facts alleged by Grippo were analogous to the facts in *In re Bauer.* *Id.* at 1223. In both instances, the broker " 'accepts payment for securities that he never intends to deliver.' " *Id.* at 1223. Thus, the court held that Grippo had pled a securities fraud claim "even though he failed to identify any particular security purchased, because Perazzo accepted and deposited Grippo's monies as payment for securities." *Id.* at 1223–24.

In *Instituto de Prevision Militar v. Merrill Lynch,* 546 F.3d 1340 (11th Cir. 2008), the Eleventh Circuit again held that the actual purchase of securities was not necessary to satisfy the "in connection with the purchase or sale" requirement. In that case, Instituto de Prevision Militar ("IPM")—a decentralized agency of the Republic of Guatemala that administers the pension funds of the Guatemalan Armed Forces—invested in "retirement trust accounts" with Pension Fund of America ("PFA"). *Id.* at 1342. Merrill Lynch was the trustee for the account and actively promoted and vouched for PFA. *Id.* at 1342–43. IPM wired the funds to Merrill Lynch and Merrill Lynch placed the funds in an account in PFA's name. *Id.* at 1343. Merrill Lynch allowed PFA to transfer money out of the account at its discretion. *Id.* IPM eventually discovered that PFA was stealing rather than investing the money and sued PFA and Merrill Lynch alleging securities fraud under Section 10(b). *Id.* at 1343–44. The district court dismissed IPM's complaint. In concluding that the "in connection with the purchase or sale" requirement was satisfied for purposes of SLUSA preemption (*id.* at 1351), the Eleventh Circuit relied on

*Zandford* and *Grippo*,[7] The court explained that IPM had alleged a "fraud that induced it to invest with PFA, which means that its claims are 'Fin connection with the purchase or sale' " of a security. *Id.* at 1349.

*Schnorr v. Schubert*, 2005 WL 2019878 (W.D.Okla.2005), is another instance of a court's construing the "in connection with the purchase or sale" requirement in a situation that did not involve the actual purchase or sale of securities. In *Schnorr*, the plaintiffs alleged that they deposited their money in defendants' non-existent trading accounts, and defendants took the money. *Id.* at 1–2. After the ponzi scheme came to an end, the plaintiffs discovered that the money was never used by defendants to purchase securities. *Id.* at 2. In concluding that SLUSA preempted the plaintiffs' claims, the district court concluded that the "in connection with the purchase or sale" requirement was satisfied even without an actual purchase or sale of a security by the defendants. Relying on *Zandford*, the court explained,

> When the Supreme Court adopted the SEC's "broad reading" of the phrase "in connection with the purchase or sale of any security" in *Zandford*, it also adopted the SEC's position that "a broker who accepts payment for securities that he never intends to deliver, or who sells customer securities with intent to misappropriate the proceeds, has acted 'in connection with the purchase or sale of any security.' "

*Id.* at 5. The court also relied on the Eleventh Circuit's decision in *Grippo*, explaining that "a plaintiff need only allege that money changed hands in connection with a *contract* for the purchase or sale of

securities; no actual purchase or sale of securities need be alleged" in order to satisfy the "in connection with the purchase or sale" requirement. *Id.* (Emphasis in original).

The Court has not found any Supreme Court or Second Circuit jurisprudence that directly addresses whether phony purchases or sales of securities can be relied on to satisfy the "in connection with" requirement. However, given the *Zandford* Court's reliance on *In re Bauer* (where there were no actual sales, only the entrustment of money and its theft), it seems likely that the requirement can be satisfied in circumstances like those at bar-where the plaintiffs part with money intending that it be invested in securities, only to have the person to whom that money is entrusted steal it. And while this is not dispositive, it bears noting that all of my colleagues who have encountered this issue in Madoff-related cases have concluded that, in the context of his Ponzi scheme, the "in connection with" requirement is satisfied by his phony purchases and sales. *See, e.g., In re Beacon Assocs. Litig.,* 745 F.Supp.2d 386, 409–11 (S.D.N.Y.2010); *Barron v. Igolnikov,* 2010 WL 882890, at **4–5 (S.D.N.Y. Mar. 10, 2010); *Levinson v. PSCC Servs.,* 2009 WL 5184363, at *7 (D.Conn. Dec.23, 2009).

#### (d) *Causation*

The SCAC pleads both transaction causation and loss causation.

■■■ Transaction causation is akin to reliance; it requires only an allegation that but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction. Plaintiffs have plainly alleged that,

7. In *Institute de Prevision Militar,* the Eleventh Circuit interpreted the "in connection with the purchase or sale" requirement for purposes of SLUSA preemption. Because the "in connection with" language in SLUSA is

identical to the language in Section 10(b), the Supreme Court has applied the same "broad interpretation" in both contexts. *Merrill Lynch v. Dabit,* 547 U.S. 71, 85–86, 126 S.Ct. 1503, 164 L.Ed.2d 179 (2006).

but for JPJA's failure to disclose the due diligence issues, they would not have entrusted JPJA with their money with the understanding that it would be placed with Madoff for further investment, either directly or via Income Plus. (*See, e.g.,* SCAC ¶¶ 110 and 153.)

 As for loss causation: a misrepresentation or omission is the proximate cause of an investment loss if the risk that caused the loss was within the zone of risk concealed thereby. *In re Omnicom Grp., Inc. Sec. Litig.,* 597 F.3d 501, 513 (2d Cir.2010). "Loss causation is established if Plaintiffs allege 'that the subject of the fraudulent statement or omission was the cause of the actual loss suffered,'" *In re Beacon Assocs. Sec. Litig.,* 745 F.Supp.2d 386, 413, 2010 WL 3895582. at *20 (S.D.N.Y. Oct. 5. 2010) (citing *Lentell v. Merrill Lynch & Co., Inc.,* 396 F.3d 161. 173 (2d Cir.2005)). Here, as Judge Sand found in *Beacon Associates,* the subject of the misrepresentations and omissions was the inability of either JPJA or Ivy to perform due diligence on whatever monies were invested with Madoff. In the absence of meaningful due diligence and monitoring, loss from misappropriation is plainly within the zone of risk that was concealed by JPJA's failure to advise its clients that no due diligence would be performed.

It is unquestionably the case that Bernard Madoff's monumental fraud was the ultimate cause of Plaintiffs' loss. However, just as success has many fathers, an injury can have more than one proximate cause. Here, investors were told that they were putting their money in the hands of experienced money managers, who would conduct appropriate due diligence before placing their funds with other managers (including specifically Madoff). Due diligence is no guarantee against loss, but an investor who knows that *no* due diligence is being conducted appreciates that his investment is subject to a greater degree of risk—one that he might not be willing to tolerate—and has the opportunity to avoid making it.

It is true that Plaintiffs may have difficulty *proving* loss causation, because of an unusual twist in the Madoff affair: even with due diligence (or with such due diligence as the obstructive Madoff would permit), experts in the securities industry, including the SEC, were unable to discern that he was running a Ponzi scheme. But the issue today is whether Plaintiffs have pleaded loss causation—not whether they can prove it.

 As Judge Sand recognized, when a business promises to conduct due diligence but fails to uphold its promise, an aggrieved investor's remedy ordinarily lies in a breach of contract action, rather than a private right of action under the federal securities laws. *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1176 (2d Cir.1993), Only when the adviser makes its promise with no intention of fulfilling it does the breach of contract claim turn into a federal securities claim. The SCAC pleads facts that, if proved, would warrant a finding that JPJA made its promise to conduct due diligence without intending to fulfill that promise.

According to the SCAC, JPJA learned that Ivy was not able to perform due diligence on Madoff in August 2001—well before it issued the 2003 OM on which investors in Income Plus relied, or entered into any subsequent DIMAs. The importance of JPJA's promise to vet investments thoroughly formed part of the consideration for the investments made by and through the Jeanneret Defendants—Jeanneret was hired to "manage" the investors' money, after all which satisfies the "consideration" requirement announced by the Second Circuit in *Luce v. Edelstein,* 802 F.2d 49, 55 (2d Cir.1986). Yet a fair reading of the

SCAC reveals that JPJA had no ability to perform its own due diligence on Madoff, and that it knew full well that Ivy could not perform any Madoff-related due diligence, either. So if JPJA and its principals were indeed aware no later than 2001 that Ivy could not perform due diligence due to limits set by Madoff—as is alleged in both the Attorney General's complaint and the SCAC—then any subsequent promise of thorough and complete due diligence made by JPJA to its clients falls into the category of promises made with no real intention of performing them.

### (e) *Scienter*

This leaves scienter the element on which so many securities fraud pleadings falter. Scienter is a "mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights. Ltd.*, 551 U.S. 308, 319, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (internal quotation marks and citation omitted). "[T]he facts alleged must support an inference of an intent to defraud the plaintiffs rather than some other group." *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir.2009) (quoting *Kalnit v. Eichler*, 264 F.3d 131, 140–41 (2d Cir.2001)). The PSLRA requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2); *see also Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir.2004). Under *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007), the inference of scienter must be at least as plausible as any other competing inference that can be drawn from the facts pleaded. In determining whether a plaintiff adequately pleads scienter, the Court must consider whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323, 127 S.Ct. 2499.

Scienter can be shown by (1) demonstrating that a defendant had motive and opportunity to commit fraud, or (2) providing evidence of conscious recklessness. *See South Cherry Street, LLC v. Hennessee Grp. LLC*, 573 F.3d 98, at 108–09 (2d Cir.2009). Conscious recklessness is a "state of mind approximating actual intent, and not merely a heightened form of negligence." *Id.*, 573 F.3d at 109 (quoting *Novak v. Kasaks*, 216 F.3d 300, 312 (2d Cir.2000)). Recklessness is "at the least, ... an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Novak*, 216 F.3d at 308. Thus, scienter is adequately pleaded when the "complaint sufficiently alleges that the defendants (1) benefited in a concrete and personal way from the purported fraud ...; (2) engaged in deliberately illegal behavior ...; (3) knew facts or had access to information suggesting that their public statements were not accurate ...; or (4) failed to check information that they had a duty to monitor ...." *South Cherry*, 573 F.3d at 110 (quoting *Novak*, 216 F.3d at 311).

Plaintiffs initially argued (and continue to argue) that JPJA should have discovered that Madoff was operating a Ponzi scheme because of various "red flags" that should have been obvious to any investment manager. As has been true in other cases, the existence of "red flags" does not satisfy the scienter requirement. Plaintiffs allege that Ivy—which was contractually responsible for performing due diligence on any manager it introduced to JPJA, including Madoff—gave what Judge Sand described as "muted" signals about its concerns *vis a vis* Madoff. For the pleading to plausibly plead scienter, JPJA should have been able to infer,

from those "muted" signals, that Madoff's enterprise was a fraud. But the SCAC specifically alleges that Ivy never revealed the most salient of facts: the withdrawal of its own monies from any investment in Madoff. And there is no allegation that JPJA was actually aware of most of the "red flags" that were publicly known. Neither is there any allegation that JPJA knew that individuals like Boston area investor Harry Markopolous had alerted the SEC to the possibility of fraud (the SEC, of course, could not recognize a Ponzi scheme even when one was pointed out to it). Plaintiffs' "red flags" theory of scienter is no different from the theory rejected by this court and the Second Circuit in *South Cherry:* had JPJA investigated Madoff, it would have learned that he was a fraud. 573 F.3d at 112. I reject it as sufficient to plead scienter in this case as well.

However, the SCAC does allege "strong circumstantial evidence of conscious misbehavior or recklessness" as against JPJA. *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,* 553 F.3d 187, 198 (2d Cir.2009). JPJA's receipt of the August 2001 letter, combined with the 2007 amendment in which it secretly released Ivy from any responsibility for monitoring Madoff, suggest that JPJA was at a minimum reckless, both before 2004 and after, with respect to a significant portion of the money entrusted to it.

The 2001 letter is of particular significance, because JPJA had heard Ivy express various concerns about Madoff, even while pronouncing him "essentially legitimate." Even though Ivy allegedly failed to reveal to JPJA the most significant information about its doubts, JPJA and it principals knew enough to make Ivy's announcement that Madoff's rules prevented Ivy from performing due diligence should have made a difference to JPJA. (See SCAC ¶ 123.) Furthermore, the SCAC alleges that JPJA Director Paul Perry admitted, soon after the Madoff fraud became public, that JPJA itself had tried to replicate Madoff's results many times, but its own internal calculations and analysis had never supported Madoff's reported results. (*See Id.* ¶ 147.) Yet JPJA continued to place clients' monies with Madoff. (*Id.* ¶ 124.) These allegations give rise to an inference of conscious misbehavior or recklessness sufficient to withstand a motion to dismiss the securities fraud claim.

In view of the foregoing, the SCAC states a claim against JPJA for securities fraud under Section 10(b) and Rule 10b–5, Of course, the well-pleaded claim will not support recovery on behalf of the broad classes (dating back to 1999) that are asserted in the SCAC. Both the two year/five year statute of limitations, *see* 28 U.S.C. § 1658(b), and the pendency of the *Beacon Associates* action (where at least some of the Income Plus class members are members of the plaintiff class), could significantly reduce the size of the Plaintiff classes. Indeed, it appears that the named Plaintiffs may be among those whose claims are time barred, in whole or in part which would certainly make them ineligible to represent a class asserting timely claims. Those issues, however, remain to be worked out, most likely in connection with a motion for class certification.

### 2. Claims Under Section 20 of the '34 Act.

Plaintiffs sufficiently plead Section 20 claims for misdisclosure and nondisclosure against Jeanneret and Perry personally. For essentially the reasons articulated by the Securities Class Plaintiffs in their opposition to the motion, I conclude that Jeanneret's and Perry's status as control persons has been sufficiently pleaded to withstand a motion to dismiss. Their motions to dismiss the claims pleaded against them individually are denied.

### 3. Claims Under the Investment Advisers Act.

 Both classes have asserted claims against the Jeanneret Defendants under the Investment Advisers Act of 1940, 15 U.S.C. § 80b–6(a) and 15. That statute renders void any investment contract whose formation or performance would violate the Investment Advisers' Act. The United States Supreme Court has recognized a private right of action for rescission of investment advisory contracts and for restitution of consideration paid pursuant to such contracts. *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 24, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979). Plaintiffs seek to rescind their advisory contracts with JPJA and restitution of fees paid to JPJA.

The Jeanneret Defendants argue that Plaintiffs lack standing to assert these claims, but that argument fails in light of *Transamerica.* Defendants also argue that Plaintiffs have failed to plead the fraud that underlay their investment contracts with the required particularity, Fed. R.Civ.P. 9(b), but the above-recited analysis of Plaintiffs' securities fraud claims gives the lie to that argument as well.

The Jeanneret Defendants' motion to dismiss the IAA claims is denied.

For the foregoing reasons, the Jeanneret Defendants' motion to dismiss the federal securities law claims asserted against them is denied in its entirety.

### III. The Ivy Defendants' Motion to Dismiss the Federal Securities Claims is Granted in Part and Denied in Part.[8]

At the outset, the Court notes that the only Individual Ivy Defendants against whom Plaintiffs assert 10b–5 claims are Simon, Wohl, and Geiger. The only claims asserted against the other Individual Ivy Defendants are Section 20(a) claims.

### 1. Section 20 Claims Against Most Individual Ivy Defendants Are Dismissed.

 With respect to the Section 20(a) claims asserted against Individual Ivy Defendants other than Simon, Wohl, Geiger and Meschi, the Court agrees with Judge Sand's finding in *Beacon Associates* that Plaintiffs have not pleaded facts with sufficient specificity to establish their culpable participation in any fraudulent activity. Accordingly, the Section 20(a) claims against the Individual Ivy Defendants other than Simon, Wohl, Geiger and Meschi are dismissed. This disposes of the entire lawsuit as to those Defendants. Henceforth, the term "Ivy 30(b) Defendants" refers to Ivy and Simon, Wohl and Geiger, and the term "Ivy Defendants" refers to Simon, Wohl. Geiger *and* Meschi.

### 2. Section 10(b) and Rule 10b–5 Claims Against the Remaining Ivy Defendants.

If Plaintiffs' version of the facts is correct (and I must draw all inferences in their favor at this stage), then this is what it alleges: Ivy—concerned that Madoff's wildly successful operation might not be legitimate—extricated itself from its investment in the Ponzi scheme in the year 2000, while deliberately and advisedly structuring its communications with Jeanneret so that JPJA and its clients would not dump their Madoff interests. Ivy sold its interest in Madoff and advised its own clients to stay away from him, even while telling Jeanneret, "We have no reason to believe there is anything improper in the Madoff operation." (SCAC ¶ 110) (quoting

---

**8.** The SCAC contains a claim under the IAA against Ivy, but that claim has been withdrawn. (See Pl. Br. in Opposition at 135, n. 124.) Therefore, the only federal securities claims asserted against the Ivy Defendants are claims under Section 10(b) and Rule 10b–5 and Section 20 (control person liability).

January 1999 Letter from Ivy to JPJA.) It did this after retaining, for several years, a position (albeit a declining position) in Madoff for the express purpose of bolstering the belief of Jeanneret and others in the soundness of investing in Madoff. It engaged in this deceitful behavior in order to inflate its assets under management (thereby making itself an attractive takeover candidate) and earn fees, while limiting any legal liability it might already have incurred as a result of being the JPJA's "allocator and introducer" with respect to Madoff. Ivy's desire to limit its own liability caused it, after weighing the risks, to devise the strategy of divesting its proprietary Madoff investment and advising new clients not to invest with Madoff, but not warning JPJA away from Madoff by divulging the full extent of its doubts.

In short, Ivy is accused of protecting its own flank while (1) accreting its purse with money earned from exposing others to high risk investments, and (2) making itself more attractive to potential suitors (BONY) with "assets under management" that were inflated with money that was being funneled into what Ivy suspected was a Ponzi scheme,

The SCAC is far from "bereft of allegations of deceptive conduct by Ivy," as the Ivy Defendants contend in their moving papers. It is, rather, replete with allegations of deception by Ivy-deception that

Ivy's executives acknowledged in their internal communications, and that continued for many years. The pleading before this Court also raise a strong inference of scienter on the Ivy Defendants' part, for the reasons cogently explained by Judge Sand at pages 23–27 of his opinion.[9]

Assuming the allegations of the complaint to be true, the position of the Ivy Defendants is nothing like the position of Hennessey, the investment adviser in *South Cherry St., LLC v. Hennessee Group LLC*, 573 F.3d 98 (2d Cir.2009). Nothing in the *South Cherry* complaint even hinted at the possibility that the Hennessey firm was putting clients into Samuel Israel's Bayou Funds, or failing to advise them to get out of Bayou, while simultaneously extricating itself from those very investments because Hennessey's principals suspected that he might be a fraud. Here, by contrast, the Ivy Defendants are alleged to have made numerous statements over many years to the Jeanneret Defendants, to the effect that their only concern about Madoff was that he had too much money under management— even while their concerns about being unable to make sense of his strategy or replicate his results had led them to take their own money out of his funds years before. Nor were there any allegations in *South Cherry* comparable to some of the background allegations [10] in this case in-

9. Ivy argues, "Plaintiffs would have the Court believe that the Ivy Defendants, alone among the hundreds of institutions that invested with Madoff for over two decades, figured out within a limited window of two years that Madoff was running a Ponzi scheme yet somehow found it in their interest to keep that information secret." However improbable an "Ivy alone" theory might have been, it is no longer the case (if it ever was) that "Ivy alone" is alleged to have intuited the truth about Madoff but kept silent for its own purposes. In recent weeks, Madoff's banks have been sued on a theory similar to the one employed against Ivy. *Picard v. UBS, et al. (In*

*re Bernard L. Madoff Inv. Sec. LLC)*, No. 10 Ap. 4285, 2010 WL 4751871 (Complaint filed Nov. 23, 2010 Bankr.S.D.N.Y.); *Picard v. JPMorgan Chase & Co. et al. (In re Bernard L. Madoff Inv. Sec. L.L.C.)*, No. 10 Ap. 4932, 2010 WL 5675729 (Complaint Dec. 02, 2010 Bankr, S.D.N.Y.).

10. I use the label "background allegations" because, as discussed at oral argument, the scheme to keep JPJA and others in Madoff by having Ivy retain a small stake in his fund apparently ended sometime in 2000—more than five years before the complaint in this action was filed—and so cannot be the basis

cluding the seemingly callous statement by Larry Simon that it was "important [for Ivy] to maintain at least some level of Ivy fund investments with Madoff in order to send a message to [Ivy] advisor clients that we have confidence in BLM." (SCAC ¶ 97) (quoting Simon December 1998 e-mail to Wohl.)

So the issue raised by Ivy's motion is not whether the allegations, if proved, are sufficient to state a fraud claim, under even the most heightened rules of pleading. Judge Sand has already answered that question, and I do not quarrel in the slightest with his conclusions. Neither, apparently, do public officials like the New York State Attorney General and the Secretary of Labor, who have independently sued the Ivy Defendants on the basis of these very allegations.

No, the issue is whether the members of the two private Plaintiff classes can sue the Ivy Defendants under the federal securities laws for their alleged misconduct. That is an entirely separate question.

Judge Sand concluded, in the *Beacon Associates* case, that there existed a private right of action under Section 10(b) and Rule 10b–5 for investors in Beacon's Madoff fund. I agree with him as to the JPJA Direct Investor Class, but I reach opposite conclusion with respect to the Income Plus Class. I believe the latter Class has only the right to commence a derivative action on behalf of Income Plus.

(a) *The Claim of the Income Plus Class*

█ Ivy denies that Plaintiffs have alleged any misrepresentation on Ivy's part. However, it argues that, if any misrepresentation claim exists, it belongs to Income Plus, and can only be asserted derivatively by the Plaintiff class on behalf of that entity. Since Plaintiffs eschew any intention of bringing a derivative claim, the Ivy Defendants urge that the securities claims

asserted against it by the Income Plus Class must be dismissed.

The Ivy Defendants are correct.

In *Blue Chip Stamps*, the United States Supreme Court held that "shareholders, creditors, and perhaps others related to an issuer who suffered loss in the value of their investment due to corporate or insider activities in connection with the purchase or sale of securities" are barred from bringing a direct action for damages under Rule 10b–5. 421 U.S. 723, 738, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). They may sue only in "a derivative action on behalf of the corporate issuer if the latter is itself a purchaser or seller of securities." *Id.*

Of course, the facts of this case are nothing like the facts in *Blue Chip Stamps* (a classic insider trading case), but Ivy argues by analogy as follows: the Income Plus Plaintiffs did not place their money with Madoff. Instead, they purchased interests in a feeder fund (Income Plus), which pooled the money of all *its* investors and re-invested that money with Madoff—who in turn stole it. The Madoff losses thus flowed directly to Income Plus, not to its limited partners—even though Plaintiffs were the ultimate source of the money that disappeared into the Ponzi scheme. Therefore, Plaintiffs can only sue Ivy on behalf of the Fund, whose assets were lost.

Plaintiffs argue that Ivy's *Blue Chip Stamps* argument is not sound on the facts of this case, because JPJA has no claim against Ivy sounding in fraud if misrepresentations and omissions were made to JPJA, it was JPJA's customers, not JPJA itself, who were damaged thereby. Furthermore, it was JPJA, using Income Plus as its vehicle, that continued to invest Plaintiffs' money with Madoff for years after learning that no due diligence was

for a timely "scheme liability" claim under Rule 10b–5(a) or (c).

being conducted on those investments—and earned considerable fees for doing so. JPJA and its principals might have a claim against Ivy for any liability they have to Plaintiffs, but such a claim could not be asserted derivatively by the investors in Income Plus (and might well be barred by the doctrine of *in pari delicto* ).

But Plaintiffs' argument fails because they erroneously conflate JPJA with Income Plus, the investment vehicle created by JPJA. Plaintiffs have no ownership interest in JPJA; they could not sue derivatively on behalf of JPJA, even if JPJA had a viable claim against Ivy. They do, however, have interests in Income Plus—a wholly separate entity, albeit one created and managed by JPJA—and they *can* sue derivatively on behalf of Income Plus, to recover monies lost by Income Plus to Madoff. Where, as here, the only loss to the Income Plus Plaintiffs occurred because Madoff's scheme eviscerated the value of their investment in Income Plus, the members of the Income Plus Class can redress their grievance by asserting a derivative claim on behalf of Income Plus, which actually lost "Plaintiffs'" money. Because Income Plus' assets came ultimately out of Plaintiffs' pockets, Income Plus would (presumably) distribute any funds recovered by way of a derivative action to its investors in accordance with the terms of their agreement. But the claim against Ivy belongs to Income Plus, not directly to the Fund's investors.

I thus conclude that the Income Plus Plaintiffs do not have a direct action against Ivy to recover losses in their Income Plus interests that are attributable to the Madoff Ponzi scheme.

Because I reach this conclusion, I do not need to address the adequacy of any of the other arguments raised by the Income Plus Plaintiffs: the so-called "misrepresentation to an agent" or "attorney-in-fact" argument, which Judge Sand sustained in the *Beacon Associates* case; whether Ivy's failure to tell JPJA that it had divested itself of any interest in Madoff occurred "in connection with the purchase or sale of a security," as required to establish liability under Section 10(b) and Rule 10b–5, or whether the so-called "scheme" outlined in Plaintiffs' letter of December 17, 2010 can actually give rise to scheme liability as to the Income Plus Class or not.[11]

The Section 10(b) and Rule 10b–5 claims of the Income Plus class asserted against the Ivy 10b Defendants are dismissed, without prejudice to the assertion of derivative claims on behalf of Income Plus itself.

### (b) *The Claims of the JPJA Direct Investor Class*

Plaintiffs assert that both non-disclosure/misrepresentation and scheme liability claims lie against Ivy on behalf of the Direct Investor Class. The Ivy 10(b) Defendants assert a variety of counterarguments.

#### *(i.) PIMCO and Secondary Liability.*

██ With respect to the non-disclosure or misdisclosure claim under Rule 10b–5(b), Ivy's principal argument is that the claims are barred by the recent Second Circuit decision in *Pacific Investment Management Co. LLC v. Mayer Brown LLP ("PIMCO")*, 603 F.3d 144, 148 (2d Cir.2010) (PIMCO). *PIMCO* holds that so-called "secondary actors" (defined as "lawyers ... accountants, *or other parties who are not employed by the issuing firm whose securities are the subject of allega-

---

11. I do make note of one salient item: The fact that the members of the Plaintiff class have only a derivative claim actually solves the conundrum raised by the fact that any statements or omissions made by Ivy were made to JPJA (the Manager of Income Plus)—not to Plaintiffs themselves.

tions of fraud") *PIMCO,* 603 F.3d at 148 n. 1 (emphasis added) cannot be held liable, under Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b–5 thereunder, for statements made to the investing public by the issuing firm—even if the secondary actors helped to craft those statements unless the statements are explicitly attributed to the secondary actors. The Second Circuit concluded that the actions of secondary actors in helping an issuer to draft and revise portions of public documents amounted at most to aiding and abetting the issuer's alleged fraud—for which no private right of action exists. *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994).

Clarifying arguably ambiguous or conflicting Second Circuit precedents, the Court of Appeals flatly stated that, "[S]econdary actors can be liable in a private action under Rule 10b–5 for only those statements that are explicitly attributed to them. The mere identification of a secondary actor as being involved in a transaction, or the public's understanding that a secondary actor 'is at work behind the scene' are alone insufficient." *PIMCO, supra.,* 603 F.3d at 155.

The Circuit specifically and unambiguously stated that it was adopting a "bright line" rule to place limits on a judicially-created private right of action for primary violations of the federal securities laws: "An attribution requirement makes clear—to secondary actors and investors alike—that those who sign or otherwise allow a statement to be attributed to them expose themselves to liability. Those who do not are beyond the reach of Rule 10b–5's private right of action." *Id.* at 156–57.

To the extent that the JPJA Direct Investor Class seeks hold Ivy responsible for statements made to them *by JPJA* in the DIMAs or investment contracts they purchased *from JPJA,* I am constrained to dismiss any claim under Rule 10b–5(b) as barred by *PIMCO*—even though I am sustaining analogous non-disclosure claims against the Jeanneret Defendants. I disagree with Plaintiffs about the need for "further clarification of the attribution standard" (Pl. Br. at 51). In a world of difficult-to-decipher, even mystifying, appellate decisions in the field of securities law, *PIMCO* is a welcome model of clarity. It means what it says. Particularly here, where it is conceded that the DIMAs do not even mention Ivy's name, it is not possible to stretch the bounds of Rule 10b–5(b) to render the Ivy 10(b) Defendants liable to JPJA's Direct Investor clients under that section of the rule.

Even if something remains of the Circuit's decision in *In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63 (2d Cir.2001), after *PIMCO* (and I am not sure that anything does), I reject Plaintiffs' argument that *Scholastic* renders Ivy liable to the Direct Investor Class because Ivy was an "insider" with respect to JPJA. Not a single allegation in the SCAC leads plausibly to the conclusion that Ivy was an "insider" at JPJA. Ivy is not alleged to have had any ownership in JPJA or its operations; Plaintiffs have not (and most likely cannot, consistent with Fed.R.Civ.P. 11) asserted a Section 20 "control person" claim relating to the operations of JPJA against Ivy and its principals. And Plaintiffs assert not a single allegation of fact tending to show that JPJA gave any Direct Investor money *to IVY* to manage.

Ivy is, in essence, alleged to have brokered or facilitated JPJA's ability to place funds with Madoff, by introducing JPJA to Madoff. A broker or finder or facilitator is a classic example of an outsider who plays a behind-the-scenes role in a business transaction. *PIMCO* plainly forbids holding such a person liable for misstate-

ments by another party—in this case, the Jeanneret Defendants—absent attribution. There was no attribution here.

The fact that at least some of the statements for which Direct Investor Class seeks redress concerned work that was to be performed by Ivy does not alter this analysis. To take one example: If the email traffic recounted in the Attorney General's complaint and the SCAC is accurate, then it is beyond cavil that Ivy did not conduct anything remotely like due diligence into Madoff. But there is also no question that Ivy *disclosed* this fact to JPJA—at first obliquely, by saying that it could not "close the loop" on Madoff, and then explicitly, in the August 2001 letter. It was JPJA, not Ivy, that failed to pass this critical information on to its clients.[12] Ivy may well have known that JPJA was not informing its clients about this particular deficiency, but the fault remained with the party obliged to disclose—which was JPJA, not Ivy.

*(ii.) Misrepresentation to an Agent*

■ To take themselves out of *PIMCO*, Plaintiffs argue that the Ivy 10(b) Defendants can be held liable to them on a wholly different theory: They want Ivy to be responsible for statements it made (or should have made but did not make) to JPJA that caused JPJA to place investors' money with Madoff. They contend that the Plaintiff Class can assert those claims—*even though no fact is alleged suggesting that these investors were aware of Ivy's misstatements, let alone that they relied on them*—because JPJA was acting as Plaintiffs' agent when Ivy misled it or failed to disclose facts that would have made its reassuring statements about Madoff "not misleading." Given the familiar rule that statements made to an agent are deemed made to its principal, *see* Restatement (First) of Agency § 315 (1933); 3 Am.Jur.2d, *Agency* § 287 (2010), the Plaintiff classes contend that it is irrelevant whether class members actually knew what Ivy was (and was not) telling JPJA— or, for that matter, whether they were aware of Ivy's "behind the scenes" role as JPJA's investment advisor.

In *In re Beacon Associates,* Judge Sand accepted the identical argument: He concluded that the plaintiff class' Rule 10b–5(b) nondisclosure claims ought not be dismissed on motion, because the Beacon Associates complaint "sufficiently alleged that [Beacon] *and [Jeanneret]* were acting as their agents, as the Beacon OMs *and the JPJA DIMAs* explicitly authorize [Beacon] and JPJA to act as Plaintiffs' attorneys-in-fact." 745 F.Supp.2d at 408, n. 10, 2010 WL 3895582, at *15, n. 10 (citing *Mantella v. Mantella,* 268 A.D.2d 852, 701 N.Y.S.2d 715 (N.Y.App.Div.2000)) (emphasis added). Indeed, as will be immediately apparent, Judge Sand effectively

---

12. Plaintiffs' reliance on cases like *Brass v. American Film Techs., Inc.,* 987 F.2d 142, 151–52 (2d Cir.1993) is unavailing, even though *Brass* involved conduct that was alleged to be both common law fraud and securities fraud. In *Brass* the Second Circuit noted a "tendency in New York to apply the rule of 'superior knowledge' in an array of contexts in which silence would at one time have escaped criticism." *Brass,* 987 F.2d at 151. Plaintiffs assert that *Brass* is particularly instructive in this case New York law governs the Income Plus offering. Accordingly, plaintiffs contend that Ivy's silence is actionable under Rule 10b–5 since Ivy had a duty to disclose which arose from "one party possess[ing] superior knowledge not available to the other [ . . . ] [and the knowledgeable party] know[ing] that the other [party] is acting on the basis of mistaken knowledge." *Rizzo v. The MacManus Group, Inc.,* 158 F.Supp.2d 297, 302 (S.D.N.Y.2001) (citing *Brass,* 987 F.2d at 150–151). But that argument rests on a doctrine of New York law—not federal securities law—and the analysis does not survive *PIMCO* in the context of a federal securities claim.

held that Ivy's alleged misrepresentations and omissions could form the basis of a direct action against Ivy by members of the Direct Investor Class.

Nonetheless, I have to consider Ivy's arguments in support of its motion to dismiss the claims of the JPJA Direct Investor Class. Because the JPJA Direct Investor Class was not a party to the action before Judge Sand, his statement that Ivy's alleged misrepresentations and omissions could form the basis of a direct action against Ivy were not necessary to support his ultimate judgment. *See* 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4421 (2d ed. 2002) ("Issue preclusion attaches only to determinations that were necessary to support the judgment entered in the first action."); *see also MTS, Inc. v. 200 East 87th Street Assocs.*, 899 F.Supp. 1180, 1184 (S.D.N.Y.1995).

Ivy first observes that this "misrepresentation to an agent" theory is actually not pleaded anywhere in the SCAC, That is correct, and affords a simple basis for dismissing the federal securities claims as pleaded. However, at this (still) preliminary stage of litigation it would be easy enough for Plaintiffs to amend the SCAC to correct this oversight, and there is absolutely no reason why I should simply dismiss the Direct Investor claims without addressing Ivy's other arguments—arguments that could (but in the end do not) render amendment a futility. I will, therefore, consider Ivy's other arguments.

Ivy next argues that any statements or omissions it made or did not make to JPJA were not made "in connection with the purchase or sale" of any security the DIMAs and Madoff's ostensible trades not involving any "security." Ivy also argues that any misrepresentations it may have made to JPJA were not "in connection with" the purchase or sale of either the DIMAs or Madoff's trades, because JPJA

was not Ivy's "agent" in connection with either their decision to enter into DIMAs with JPJA or with Madoff's ostensible securities transactions.

For the reasons set forth above, I conclude that the SCAC sufficiently pleads that the DIMAs and the Madoff trades as "securities"

As for the "JPJA was not Plaintiff's agent" argument: Ivy is correct when it argues that JPJA was not the DIMA-holder's attorney in fact (agent) for the purpose of either opening the account in the first place or putting additional funds into that account. The DIMA appointed JPJA as the investor's attorney in fact *only* "to invest and reinvest the assets received and deposited with the custodian." (SCAC ¶ 153.) JPJA did not make the Direct Investor Plaintiffs' decision to enter into the DIMA in the first place, the investors themselves did that, and any agency arrangement did not come into being until the DIMAs were purchased. The account holders also made their own decision about whether to add funds to those accounts. JPJA as agent (attorney-in-fact) took no such action on behalf of any member of the putative Direct Investor Class. Thus, no misrepresentation or omission by Ivy to JPJA was relied on by JPJA to the Direct Investors' detriment in connection with the actual purchase of the DIMA.

But since, like Judge Sand, I have concluded that Madoff's theft of the money that Plaintiffs invested for purposes of purchasing securities satisfies the purchase-or-sale requirement, this conclusion becomes irrelevant. All of Madoff's phony transactions occurred after the DIMAs were signed, and all were made pursuant to JPJA's agreement with the members of the JPJA Direct Class to "invest and reinvest the assets received and deposited with the custodian" as their attorney-in-fact. JPJA was the agent of the members of the

JPJA Direct Class for the purpose of placing their funds with Madoff so that Madoff could engage in security transactions.

So we are left with Ivy's contention that it made no misrepresentations to JPJA, and omitted nothing it was actually required to disclose. Suffice it to say, for the reasons stated by Judge Sand, the SCAC alleges enough to get Plaintiffs past a motion to dismiss.

I thus conclude that it would not be futile for the JPJA Direct Investor Class to amend the SCAC to assert the "misrepresentation to an agent" theory. I will allow such an amendment to be filed within ten days of this decision.

Because there is (or will be post-amendment) enough (assuming I and my colleagues are correct about the "in connection with" requirement) to sustain a 10b–5(b) claim on the theory that misrepresentations and omissions were made to the JPJA Direct Class Members' agent (JPJA), it is not necessary to address whether Plaintiffs have adequately alleged scheme liability under Rule 10b–5(a) and (c). I note, however, that much of the so-called "scheme" (which is outlined in Plaintiffs' December 17, 2010 post-argument letter) consists of *PIMCO*-barred non-disclosures or relates only to the Income Plus Class (whose direct claims have been dismissed), rather than to the JPJA Direct Investor Class (whose direct claims have not been dismissed). The parties have not had an opportunity to refine their "scheme" arguments in light of this opinion, so it would be imprudent for me to enter into an extended discussion of the issues raised. I harbor considerable doubt, however, that any scheme liability claim on the part of the Direct Investor Class will survive a motion for summary judgment—assuming that any such claim remains in suit in light of this decision.

Finally, Ivy points out that there is no allegation that JPJA invested Direct Investor Class members' money with Madoff within five years of the filing of this action. I disagree. To the extent that there are issues about the timeliness of particular Direct Investor claims, they will have to be sorted out in connection with the inevitable class certification motion.

### 3. Plaintiffs' Claims Against BONY and Ivy Defendants Simon, Wohl and Geiger.

(a) The Claims Against Geiger and Meschi Will Not Be Dismissed on Motion Due to Alleged Discrepancies Between SCAC and the Complaint in Beacon.

▮ Individual Ivy Defendants Geiger and Meschi seek dismissal of all claims asserted Against them on the ground that Plaintiffs have no good faith basis to plead any claim against them, either under Section 10(b) (Geiger) or Section 20(a) (both Defendants).

Geiger's allegation of lack of good faith basis stems from purported discrepancies between the allegations of the SCAC and the corresponding pleading in *Beacon Associates*. In the SCAC, Geiger is identified as Ivy's Chief of Investment Management, while in the Beacon complaint he is denominated Ivy's Director of Research. This discrepancy is allegedly significant because certain alleged deceptive conduct set forth in the SCAC is attributed to Geiger in his capacity as Chief of Investment Management, while different deceptive conduct is attributed to Geiger in his capacity as Director of Research in the Beacon Complaint.

Geiger's motion to dismiss based on the discrepancies between the two complaints is denied. The only complaint before this Court is the SCAC. Whether the SCAC's allegation is consistent or inconsistent with allegations made in the Beacon Associates case is of no moment. Plaintiffs' counsel may be guilty of sloppy pleading, but that

does not afford a basis for dismissing, on pre-answer motion, a complaint that specifies deceptive conduct engaged in by the Defendant.

Meschi's analogous motion is also denied. In the SCAC, Meschi is alleged to have been a control person at Ivy by virtue of his role as Director of Research. In contrast to the specific allegations regarding Meschi's role as Director of Research contained in the SCAC, the allegations in the *Beacon* only indicate Meschi's job titles—none of which was Director of Research—and vaguely assert that Meschi "exercised control and discretion over the investment advice Ivy provided to clients." That vagueness may have afforded a basis for dismissing the complaint in Judge Sand's case, but the difference between the two pleadings—especially since the SCAC contains greater specificity affords no basis to dismiss the SCAC.

(b) The Motion to Dismiss the Primary 10(b) Claims Against the Individual Ivy Defendants is Granted in Part and Denied in Part.

In addition to 10(b) claims against Ivy, Plaintiffs bring claims against Simon, Wohl and Geiger for primary violations of section 10(b). The basis for the claims against Simon and Wohl is the same as the basis for the 10(b) claims asserted against Ivy.

■ Just as the Court found that the Income Plus Class has only the right to commence a derivative 10(b) action against Ivy on behalf of Income Plus, the Court similarly finds that primary 10(b) claims against Simon, Wohl and Geiger on behalf of the Income Plus class must be dismissed as well.

■■ For the reasons articulated by Judge Sand, I conclude that the JPJA Direct Investor Class has stated a primary liability claim against Simon and Wohl. The most serious challenge to the viability of the pleading is the statute of limitations, since most of the statements made by Simon and Wohl that form the basis for the 10(b) claims (and the section 20(a) claims as well) were made before 2004, five years before the filing of this action. However. I agree with Judge Sand that Ivy had a continuing duty to correct any misrepresentations it made to JPJA (and through JPJA, to the DIMA class members, for whom JPJA was the agent). "The duty to correct applies to statements that are false at the time they were made, and it arises 'when [the defendant] learned that its prior statement . . . was untrue.' In contrast, the more limited duty to update applies to 'a statement made misleading by intervening events, even if the statement was true when made.' " *NovaGold Resources Inc. Secs. Litig.,* 629 F.Supp.2d 272, 301 (S.D.N.Y.2009) (quoting *Lattanzio,* 476 F.3d at 154; *Overton v. Todman and Co.,* 478 F.3d 479, 487 (2d Cir.2007)). Having represented Madoff's enterprise as "essentially legitimate," Ivy had a continuing obligation to apprise the class and its agent of information that rendered its assessment of Madoff's bona fides incorrect.

Ivy, of course, argues that it DID tell JPJA about its doubts about Madoff—and of course it appears all but indisputable that Ivy told JPJA that it had become impossible to conduct any due diligence on Madoff. The DIMA Class Plaintiffs may never make it past a summary judgment motion on this claim. But their claim against Ivy, Simon and Wohl survives the motion to dismiss.

■ The primary liability claim against Geiger, however, must be dismissed. Whereas Simon and Wohl are alleged to have made many of the alleged misrepresentations underlying the claims against Ivy, I see no allegation in the SCAC that Defendant Geiger himself made any specific statement to JPJA or Plaintiffs that was

either false or misleading. Without an allegation of any specific misleading statement or omission attributed to Geiger, Plaintiffs do not state a viable primary liability claim against Defendant Geiger under section 10(b).

(c) The Motion to Dismiss the Secondary Liability Claims (Section 20) Against Simon, Wohl, Geiger and Meschi is Granted in Part (Income Plus) and Denied in Part (JPJA Direct Investors).

 In order to state a control person claim pursuant to Section 20(a), Plaintiffs must allege facts showing (1) "a primary violation by the controlled person," (2) "control of the primary violator by the targeted defendant," and (3) that the "controlling person was in some meaningful sense a culpable participant in the fraud perpetrated." *ATSI Commc'ns*, 493 F.3d at 108 (internal quotation marks omitted). A finding of "control" under the second prong requires a fact-intensive inquiry into the "power to direct or cause the direction of the management policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *See In re IPO Secs. Litig.*, 241 F.Supp.2d 281, 393 (S.D.N.Y.2003) (internal citation omitted). This "fact-intensive inquiry . . . generally should not be resolved on a motion to dismiss." *Katz v. Image Innovations Holdings, Inc.*, 542 F.Supp.2d 269, 276 (S.D.N.Y.2008). Plaintiffs need to meet the PSLRA's heightened pleading standards only for the third prong, involving culpable participation. *See In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F.Supp.2d 148, 170–71 (S.D.N.Y.2008).

As the Court has dismissed the Income Plus Class claims against Ivy, there is therefore no basis for Section 20(a) claims against Simon, Wohl and Geiger with respect to Income Plus and the Income Plus Class. The only remaining question is whether Plaintiffs' claims on behalf of the Direct Investor Class should be dismissed.

 Ivy does not contest that section 20(a) claims against Simon and Wohl are adequately pleaded as long as an underlying 10(b) violation by Ivy survives the motion to dismiss—which it has. (Ivy Rply. Mem. in Spprt. Motn. to Dis., at 44 n. 42.) While Ivy disputes Plaintiffs' allegations regarding the roles of Geiger and Meschi at Ivy, the SCAC clearly alleges that Geiger and Meschi were high-level executives at Ivy with discretion over the investment advice, oversight and administrative services that Ivy provided to clients generally. These allegations of control suffice to survive a motion to dismiss. *See Anwar v. Fairfield Greenwich Ltd.*, No. 09 Civ. 0188(VM), 2010 WL 3341636, at *27 (S.D.N.Y. Aug. 18, 2010) (control adequately pleaded against "high-level player[s]" who participated in feeder fund's decision-making). The allegations in the SCAC clearly lay out Geiger's and Meschi's culpable participation by identifying specific statements attributed to them bearing directly on Ivy's misrepresentations. In a 1998 e-mail to Simon and Wohl, Geiger, as Chief of Investment Management, suggested a strategy designed to "insulate[ ][Ivy] from liability as GP of our funds" while maintaining advisory clients' investments with Madoff. (N.Y. AG's Compl. ¶ 79.) In his role as Director of Research, Meschi represented to JPJA in 2000 that Madoff was "essentially legitimate," while admitting that Ivy could not "close the loop" on the mysterious Madoff. (*Id.* ¶ 102.)

(d) The Motion to Dismiss Secondary Liability Claims (Section 20) Against BONY is Granted.

 Plaintiffs' assert the same Section 20(a) claims against BONY in this case as they asserted in the *Beacon* case before

Judge Sand. Addressing the claims asserted by the *Beacon* plaintiffs against BONY, Judge Sand stated that plaintiffs before him "fail to plead that BONY was sufficiently culpable or involved in the underlying securities fraud violation." *Beacon Associates,* 745 F.Supp.2d at 411, 2010 WL 3895582, at *18. There being no meaningful difference in the allegations regarding the role of BONY in this case from the BONY role alleged in *Beacon,* the Court adopts Judge Sand's holding.

### IV. The Federal Securities Claims Against Margolin, Winer & Evans LLP Are Dismissed.

 Margolin, Winer & Evans LLP served as the outside auditor for Income Plus. The federal securities law claim asserted against it is a classic example of the sort of "fraud by hindsight" claim that is routinely brought against the unfortunate auditors who happen to have been engaged to audit feeder funds—claims that are just as routinely dismissed on motion. So too here.

Plaintiffs allege that Margolin was engaged to perform audits of the Income Plus Fund's financial statements in accordance with Generally Accepted Accounting Principles (GAAS). They assert that Margolin had a duty to understand details of Income Plus' investments, and that in so doing the firm was required to "do more than rely solely on the procedures it performed . . . as much of the Income Plus Fund's investment and income information available to Margolin was based on information from Madoff. . . ." Margolin is accused of failing to intuit that the many "red flags" about Madoff's operation were signs of fraud-the very same "red flags" that the SEC and the entire investment community managed to overlook for over a decade.

The federal securities claims against Margolin can be swiftly dispatched. The pleading is defective in failing to plead scienter. Any inference of fraudulent intent that is raised by the SCAC—and that would be a nebulous inference indeed is far less compelling than an inference of negligence. *South Cherry Street, LLC v. Hennessee Grp. LLC,* 573 F.3d 98, 109 (2d Cir.2009). Merely alleging that Margolin "would" or "could" or even "should" have known of Madoff's fraud if only it had paid attention to the "red flags" is insufficient to make out a 10(b) claim. *Id.* 573 F.3d at 112. The failure of income Plus' accounting firm to identify problems with Madoff's investments (or, more accurately, his lack of investments) does not constitute reckless conduct sufficient to impose Section 10(b) liability. *Decker v. Massey–Ferguson, Ltd.,* 681 F.2d 111, 120 (2d Cir.1982), cited in *Novak v. Kasaks,* 216 F.3d 300, 305 (2d Cir.2000). And allegations of GAAP or GAAS violations, standing alone, are insufficient to stale a claim for relief against an accountant under the federal securities laws. *South Cherry, supra.,* 534 F.Supp.2d at 416; *Stevelman v. Alias Research Inc.,* 174 F.3d 79, 84 (2d Cir.1999). Here, as was the case in *South Cherry* and *Stevelman,* there is absolutely no allegations of fraudulent intent on Margolin's part—indeed, there is no allegation that Margolin knew or even suspected that Madoff was engaging in fraudulent activities but deliberately shuts its eyes to the facts. *South Cherry, supra.,* 534 F.Supp.2d at 417. The SCAC contains only the same tired allegations of negligence that can be attributed to the entire securities industry concerning Madoff. As this court held in South Cherry, an inference of recklessness sufficient to sustain a securities claim is "less compelling than an opposing inference—that [the auditor's] failure to discover the fraud merely places it alongside the SEC, IRS and every other interested party." *Id.*

No Madoff-related case of which this Court is aware has sustained a federal securities claim against a feeder fund's outside auditors; courts confronted with such claims routinely dismiss them. *In re Tremont Securities Law, State Law, and Insurance Litigation*, 703 F.Supp.2d 362 (S.D.N.Y. March 30, 2010), *In re Beacon Associates Litigation*, 745 F.Supp.2d 386 (S.D.N.Y.2010), *Stephenson v. Citco Group Limited et al.*, 700 F.Supp.2d 599 (S.D.N.Y. April 1, 2010). This Court will not be the first to buck that trend.

The federal claims against the Margolin Defendants are dismissed.

## V. The State Law Claims Are Dismissed.

As was true in *Beacon Associates,* Plaintiffs assert numerous state law claims against various Defendants.

The state law claims other than the derivative claims asserted against Margolin for breach of contract and malpractice are all hereby dismissed for the reasons stated by Judge Sand, to wit: SLUSA preemption, LRISA preemption and/or Martin Act preemption.

While I join Judge Sand's decision on all of these points, I write a word addressed to the Martin Act, because Plaintiffs have submitted several Appellate Division decisions that post-date Judge Sand's opinion in *Beacon Associates.* These intermediate appellate cases hold that the Martin Act does not preempt non-fraud common law (or equitable) claims that grow out of the Madoff scandal. *Assured Guaranty (UK) Ltd. v. J.P. Morgan Inv. Met. Inc.*, 80 A.D.3d 293, 915 N.Y.S.2d 7 (1st Dep't 2010); *CMMF, LLC v. J.P. Morgan Inv. Mgmt.*, 78 A.D.3d 562, 915 N.Y.S.2d 2 (1st Dep't 2010).

Notwithstanding this new authority, I want to underscore a point made by Judge Sand that disposes of Defendants' argument issue for me.

As Judge Sand recognized, the New York Court of Appeals has never squarely addressed whether the Martin Act preempts securities-related non-fraud common law or equitable claims. Appellate Division opinions are not the last word on the subject, and the recent Appellate Division opinions cited by Plaintiffs represent a shift from earlier pronouncements. A New York Court of Appeals decision changing the rule that has been applied "almost without exception" (*see, e.g., Pro Bono Invs., Inc. v. Gerry*, 2005 WL 2429787, at *16) would of course be applied by this Court. But no such ruling has been cited by Plaintiffs.

Until such a ruling comes down (and it is far from clear that it will), this Court is bound to apply the result in the only Second Circuit case that addresses the subject of Martin Act preemption: *Castellano v. Young & Rubicam*, 257 F.3d 171, 190 (2d Cir.2001). There, the Circuit recognized Martin Act preemption of common law claims involving securities. When and if the Second Circuit alters its prior pronouncement—perhaps after certifying the question to the New York Court of Appeals, which is a request this court is not empowered to make—I will follow suit. This Court applying *Castellano,* holds that the Martin Act preempts claims of the nature asserted by Plaintiffs.

■ I also add a word concerning SLUSA. Notwithstanding the dismissal of the federal securities claims asserted by the Income Plus Class, SLUSA preludes the state-law claims that the Income Plus class asserted against the Ivy Defendants. State-law claims by a covered class action that allege fraud in connection with the sale of a security are precluded by SLUSA whether brought in federal or state court. *Kircher v. Putnam Funds Trust*, 547 U.S. 633, 637, 126 S.Ct. 2145, 165 L.Ed.2d 92 n. 1 (2006); *see also Romano v. Kazacos*, 609

F.3d 512, 520 n. 2 (2d Cir.2010). SLUSA renders such state-law claims "nonactionable;" they cannot be litigated in state or federal court unless they are brought by a plaintiff individually or as part of a class of less than 50 individual investors. *Romano*, 609 F.3d at 520 n. 2. As noted above, there is no dispute that the Class members' interests in Income Plus qualify as a security, and a "covered security" under SLUSA. The preclusion of the Class' state law claims is, therefore, not a function of the viability of its direct action claims against the Ivy Defendants under the federal securities laws.

The only two state law claims that were not covered by the various preemption rulings are derivative claims for breach of contract and malpractice against Margolin. For the reasons stated by Judge Sand in his decision dismissing analogous claims against BAMC's outside accountant without prejudice, I decline to assert supplemental jurisdiction over those claims and I dismiss them without prejudice as against the accountants in this case.

## CONCLUSION

The various motions to dismiss are disposed of as follows:

| Complaint | Defendant | Count | Holding | Location |
|---|---|---|---|---|
| **Securities Law Claims** | | | | |
| Section 10(b) on behalf of the Income Plus Class | JPJA | III | Dismissal Denied | pp. 18–38 |
| | Ivy | I | Dismissal Granted | pp. 39–45 |
| | Simon, Wohl & Geiger | I | Dismissal Granted | pp. 52–55 |
| | Margolin LLP | V | Dismissal Granted | pp. 57–59 |
| Section 10(b) on behalf of JPJA Direct Investor Class | Ivy | II | Dismissal Denied | pp. 39–52 |
| | Simon & Wohl | II | Dismissal Denied | pp. 53–55 |
| | Geiger | II | Dismissal Granted | pp. 53–55 |
| | JPJA | IV | Dismissal Denied | pp. 20–39 |
| Section 20(a) on behalf of the Income Plus Class | Robert Meschi | VI | Dismissal Granted | pp. 55–57 |
| | BONY | VI | Dismissal Granted | p. 57 |
| | Simon, Wohl & Geiger | VI | Dismissal Granted | pp. 55–56 |
| | Other Indiv. Ivy Defs. | VI | Dismissal Granted | p. 40 |
| | Jeanneret & Perry | VII | Dismissal Denied | p. 38 |
| Section 20(a) on behalf of the JPJA Direct Investor Class | Robert Meschi | VI | Dismissal Denied | pp. 55–56 |
| | Simon, Wohl & Geiger | VI | Dismissal Denied | pp. 55–56 |
| | BONY | VI | Dismissal Granted | p. 56 |
| | Other Indiv. Ivy Defs. | VI | Dismissal Granted | p. 40 |
| | Jeanneret & Perry | VII | Dismissal Denied | p. 38 |
| Rescission of Fees under the Investment Advisers Act on behalf of the JPJA Direct Investor Class | JPJA | XX | Dismissal Denied | pp. 38–39 |
| Rescission of Fees under the Investment Advisers Act on behalf of the Income Plus Class | JPJA | XX | Dismissal Denied | pp. 38–39 |

## State Law Claims

| | | | | |
|---|---|---|---|---|
| Common Law Fraud on ehalf of the Income Plus Class | JPJA | VIII | Dismissal Granted | pp. 59–61 |
| | Ivy | VIII | Dismissal Granted | pp. 59–61 |
| | Simon, Wohl & Geiger | VIII | Dismissal Granted | pp. 59–61 |
| | Margolin LLP | VIII | Dismissal Granted | pp. 59–61 |
| Common Law Fraud on behalf of the JPJA Direct Investor Class | JPJA | IX | Dismissal Granted | pp. 59–61 |
| | Ivy | IX | Dismissal Granted | pp. 59–61 |
| | Simon, Wohl & Geiger | IX | Dismissal Granted | pp. 59–61 |
| Aiding and Abetting Common Law Fraud on behalf of the Income Plus Class | Ivy | X | Dismissal Granted | pp. 59–61 |
| | Simon, Wohl & Geiger | X | Dismissal Granted | pp. 59–61 |
| | BONY | X | Dismissal Granted | pp. 59–61 |
| Aiding and Abetting Common Law Fraud on behalf of the JPJA Direct Investor Class | Ivy | XI | Dismissal Granted | pp. 59–61 |
| | Simon, Wohl & Geiger | XI | Dismissal Granted | pp. 59–61 |
| | BONY | XI | Dismissal Granted | pp. 59–61 |
| Breach of Fiduciary Duty on behalf of the Income Plus Class | JPJA | XII | Dismissal Granted | pp. 59–61 |
| | Ivy | XII | Dismissal Granted | pp. 59–61 |
| | Margolin LLP | XII | Dismissal Granted | pp. 59–61 |
| Breach of Fiduciary Duty on behalf of the JPJA Direct Investor Class | JPJA | XIII | Dismissal Granted | pp. 59–61 |
| | Ivy | XIII | Dismissal Granted | pp. 59–61 |
| Breach of Contract on behalf of the Income Plus Class | JPJA | XIV | Dismissal Granted | pp. 59–61 |
| Breach of Contract on behalf of the JPJA Direct Investor Class | JPJA | XV | Dismissal Granted | pp. 59–61 |
| Unjust Enrichment on behalf of the Income Plus Class | JPJA | XVI | Dismissal Granted | pp. 59–61 |
| | Ivy | XVI | Dismissal Granted | pp. 59–61 |
| | BONY | XVI | Dismissal Granted | pp. 59–61 |
| | Margolin LLP | XVI | Dismissal Granted | pp. 59–61 |
| Unjust Enrichment on behalf of JPJA Direct Investor Class | JPJA | XVI | Dismissal Granted | pp. 59–61 |
| | Ivy | XVI | Dismissal Granted | pp. 59–61 |
| | BONY | XVI | Dismissal Granted | pp. 59–61 |
| | Margolin LLP | XVI | Dismissal Granted | pp. 59–61 |
| Aiding and Abetting Breaches of Fiduciary Duty on behalf of the Income Plus Class | Ivy | XVII | Dismissal Granted | pp. 59–61 |

| | | | | |
|---|---|---|---|---|
| | BONY | XVII | Dismissal Granted | pp. 59–61 |
| | Margolin LLP | XVII | Dismissal Granted | pp. 59–61 |
| Aiding and Abetting Breaches of Fiduciary Duty on behalf of the JPJA Direct Investor Class | Ivy | XVIII | Dismissal Granted | pp. 59–61 |
| | BONY | XVIII | Dismissal Granted | pp. 59–61 |
| Malpractice on behalf of the Income Plus Class | Margolin LLP | XIX | Dismissal Granted | pp. 59–61 |

The Clerk of the Court is directed to close out the motions at Docket Nos. # 143, 148 and 152, and remove same from the Court's list of active motions.